STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

13-275

STATE OF LOUISIANA

VERSUS

ROBYN B. LITTLE DAVIS

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 34876-09
HONORABLE DAVID A. RITCHIE, DISTRICT JUDGE

**********

JOHN D. SAUNDERS
JUDGE

**********

Court composed of John D. Saunders, Jimmie C. Peters, and John E. Conery, Judges.

AFFIRMED.

Conery, J., dissents and assigns written reasons.

Glen D. Vamvoras
Shane Hinch
Vamvoras, Schwartzberg &Hinch
1111 Ryan St.
Lake Charles, LA 70601
(337) 433-1621
COUNSEL FOR DEFENDANT/APPELLANT:
    Robyn B. Little Davis

**John Foster DeRosier**
**District Attorney**
**Carla Sue Sigler**
**Karen C. McLellan**
**Assistant District Attorneys**
**Fourteenth Judicial District**
**P. O. Box 3206**
**Lake Charles, LA 70602-3206**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**SAUNDERS, Judge.**

On December 10, 2009, the Defendants, Robyn B. Little Davis (Defendant-Davis) and Carol Noland Saltzman (Defendant-Saltzman) were charged by grand jury indictment with the first degree murder of Defendant-Davis' husband, William Brian Davis.[1] On May 3, 2011, the indictment was amended to charge both Defendants with second degree murder. Both Defendants entered a plea of not guilty on November 7, 2011. The case was called for trial on November 7, 2011, at which time jury selection began and continued until a jury was selected on November 10, 2011. Before the conclusion of jury selection, the testimony of one of the State's witnesses, Roxanne Baumgartner, was perpetuated. The day after jury selection was completed, November 11, 2011, the State requested a continuance because of the physical health of the prosecutor in the case, Rick Bryant. Over the objections of defense counsel for both Defendants, the trial court granted the continuance. The trial court also refused defense counsels' request to swear in the jury.

On November 15, 2011, the Defendants filed a "Motion to Quash Prosecution and for the Dismissal of the Indictment with Prejudice." Subsequently, on January 6, 2012; January 18, 2012; and January 24, 2012, the trial court heard testimony and argument regarding the motion to quash and dismissal. Both Defendants argued that double jeopardy attached when the State perpetuated the testimony of Roxanne Baumgartner before the trial court granted the State's continuance based on Mr. Bryant's health. The trial court denied the motion to quash based on double jeopardy. The Defendants also argued that the charges against them should be dismissed because of the prejudice they suffered by

---

[1]This opinion addresses Defendant-Davis's appeal (13-275). Defendant-Saltzman has filed a separate appeal. (13-276).

the granting of the continuance. The trial court denied the motion to quash and dismiss the charges on the prejudice grounds as well. On March 28, 2012, this court denied a writ application filed by both Defendants. *State v. Davis and Saltzman*, 12-236 (La.App. 3 Cir. 3/28/12) (unpublished opinion). This court instructed the trial court "to proceed with the trial as expeditiously as possible, with the original jury, if such can be accomplished without resulting prejudice [sic] to any party." *Id.* If the trial could not proceed with the original jury, this court instructed the trial court to call a new jury panel. *Id.* Thereafter, on April 18, 2012, the supreme court denied a writ application filed by the Defendants. *State v. Davis and Saltzman*, 12-834 (La. 4/18/12), 85 So.3d 1255.

Attempting to comply with this court's instructions, the trial court recalled the original jurors on April 23, 2012. Because several jurors had to be excused for cause, the trial court released the original jury and a new jury was selected. Both Defendants were tried before the same jury in a thirteen-day jury trial. At the close of the evidence, the defense moved to strike the responsive verdicts of manslaughter and negligent homicide. By an 11-1 vote, the jury found both Defendants guilty of second degree murder. The trial court subsequently denied motions for new trial and for post-verdict judgment of acquittal filed by the Defendants. Finally, on August 24, 2012, the trial court sentenced both Defendants to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence.

On August 24, 2012, Defendant-Davis' attorney filed a timely motion for appeal. Pursuant to that motion, Defendant-Davis is presently before this court, alleging nine assignments of error.

**FACTS:**

On July 1, 2009, a dead body was discovered lying next to a Honda Accord off of Big Lake Road in Calcasieu Parish. When deputies responded to the scene, the car's trunk and doors were open, and the car looked like it had been jacked up to change a tire. Deputies discovered that the vehicle was registered to Defendant-Davis and that Defendant-Davis had reported her husband missing. William Brian Davis' driver's license was also found in the vehicle. According to the autopsy report and death certificate, the body was identified as William Brian Davis by dental records and the presence of tattoos on his body.

Dr. Terry Welke, the coroner for Calcasieu Parish, estimated William Brian Davis' time of death to be sometime after 12:00 p.m. on June 29, 2009. He died of four gunshot wounds, one to the head and three to the torso. Dr. Welke ruled the manner of death as a homicide.

## ERRORS PATENT:

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find no errors patent.

## ASSIGNMENT OF ERROR NUMBER SIX:

We will address this assignment first, as it attacks the sufficiency of the evidence. A finding of insufficiency would require reversal of the conviction and, thus, obviate the need for discussion of the other eight assignments of error. *See State v. Hearold*, 603 So.2d 731 (La.1992).

This court has stated the following regarding the standard for reviewing a claim of insufficient evidence:

> The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La.7/10/06), 936 So.2d 108,

170, *cert. denied,* 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007) (citing *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Captville,* 448 So.2d 676, 678 (La.1984)). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La.2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson*, 96-1048 (La.10/4/96), 680 So.2d 1165; *State v. Lubrano*, 563 So.2d 847, 850 (La.1990)). The appellate court's function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith,* 94-3116 (La.10/16/95), 661 So.2d 442.

The factfinder's role is to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than ensuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at 1270 (quoting *State v. Lambert*, 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726–27). Our supreme court has stated:

> However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall*, 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve " 'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.'" *McDaniel v. Brown*, 558 U.S. [120,] [134], 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789. Applied in cases relying on circumstantial evidence, . . . this fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville*, 448 So.2d 676, 680 (La.1984).

*State v. Strother*, 09-2357, pp. 10-11 (La.10/22/10), 49 So.3d 372, 378 (alteration in original).

*State v. Francis*, 12-1221, pp. 6-7 (La.App. 3 Cir. 4/3/13), 111 So.3d 529, 533 (alteration in original).

Defendant-Davis argues that the State's case against her was a very weak circumstantial evidence case, devoid of any evidence that she was present during the commission of the murder, directly committed the murder, aided or abetted in the murder, or directly or indirectly procured another to commit the murder. She alleges that the "evidence, when viewed in the light most favorable to the State, merely showed that Robyn Davis' cell phone may have been within the geographical area, constituting numerous square miles, at times she says she was not." There was absolutely no proof, Defendant-Davis argues, that she shot the victim or was present at the time of his death. Additionally, Defendant-Davis alleges that the State failed to exclude every reasonably hypothesis of her innocence: 1) that she was with Defendant-Saltzman running errands in Lake Charles at the time of the murder; and 2) that the victim was killed by someone else, possibly his mistress' husband, Shane Dietz.

*Preliminary Investigation*

Detective Brent Young testified that he was present when Defendant-Davis was notified of her husband's death. Once told of her husband's death, Defendant-Davis was dry-heaving and/or vomiting. Defendant-Davis was cooperative with the detectives and told them that on the day he disappeared, the victim was supposed to be going boat shopping in Beaumont. Defendant-Davis also told Detective Young that the victim was "ratholing" approximately $700.00 for a new boat. When asked if the victim kept money in his sock, Defendant-Davis said he did from time to time because of the nature of his job, collecting insurance premiums.

David Guzzardo, district manager for Union National Life Insurance Company in Lafayette, testified that the victim was an agent of the insurance company. Mr. Guzzardo explained that the agents generally collect the premiums by physically going to the homes of the policy holders, some of whom live in low-income neighborhoods. The premiums are usually paid in cash, check, or money orders.

On July 2, 2009, the day after the victim's body was discovered, Detective Les Blanchard spoke with Defendant-Davis in order to gather background information and establish a timeline of the victim's whereabouts on the day of his murder. Defendant-Davis told Detective Blanchard that the victim left for work early that morning. According to Defendant-Davis, the victim drove her Trailblazer to work because the victim's Honda Accord was having wheel trouble. The victim wanted to go boat shopping, so he came home early from work – around 11:00 a.m. The victim and Defendant-Davis went boat shopping in Lake Charles and then went to Jerry's Marine in Sulphur. They arrived back at home around 2:00 or 3:00 that afternoon. At that time, the victim took his Honda Accord and headed to Beaumont to continue boat shopping. Aimee Davis, the victim's sister-in-law, spoke with a boat dealership in Beaumont that remembered the victim calling to say he was heading that way, but the victim never made it. Defendant-Davis testified that when the victim headed to Beaumont in his Honda Accord, she took her Trailblazer to go run errands – the cleaners, the grocery store and an oil change.

Defendant-Davis told Detective Blanchard that the victim had two life insurance policies – one for $90,000.00 and one for $40,000.00. Defendant-Davis also told Detective Blanchard that she learned in March of 2009, that the victim

was having an affair with Fannie Dietz, a coworker of the victim. When she found out about the affair, Defendant-Davis confronted Ms. Dietz.

Several days later, on July 9, 2009, Detectives Blanchard and Young received permission from Defendant-Davis to search her residence and Trailblazer. With the help of Defendant-Davis' son, Justin Little, the detectives collected a box of ammunition belonging to the victim. The box of ammunition contained some 9-millimeter Hydra-Shok rounds.[2]

Defendant-Davis gave a formal statement to the detectives on July 9th. In this statement, Defendant-Davis repeated much of what she had already told Detective Blanchard on July 2nd. Defendant-Davis also told the detectives that she spoke to the victim once after she and the victim went their separate ways on the day of the murder. Then, when she attempted to call the victim again, the call went straight to voicemail. When the victim did not come home, Defendant-Davis called the police to see about reporting him missing and was told that she must wait twenty-four hours from the time she expected him home. The next morning, Defendant-Davis called the victim's work and learned that no one there had heard from him. David Guzzardo verified that Defendant-Davis called him that Tuesday morning to see if he had seen the victim. Defendant-Davis called the police that night, and a policeman came to Defendant-Davis' home. Mark Chatman, an officer with the Lake Charles Police Department, confirmed that he received a call from Defendant-Davis about a missing person and went to Defendant-Davis' home Tuesday around 4:30 p.m. Defendant-Davis told Officer Chatman that the victim was supposed to be heading to Beaumont in his Honda.

---

[2]Douglas Lancon, the State's expert in firearms and tool mark identification and ballistics, defined "hydroshock" as a "patented proprietary bullet design by Federal."

In her July 9th statement, Defendant-Davis told detectives that before she and the victim left to go boat shopping on June 29th, the victim went to Kroger to get his sick daughter (Bailey) some soup. Catherine Davis, the victim's sister, testified that Defendant-Davis told her that the victim never returned from Kroger. In her statement to detectives, however, Defendant-Davis explained that she and the victim went boat shopping after he returned from Kroger and later split ways. When they split ways, Defendant-Davis picked up Defendant-Saltzman to go run errands. As for the victim's mistress, Defendant-Davis told Detective Young that the mistress' husband, Shane, had threatened to beat the victim's "a_ _" and get him fired. Mr. Guzzardo, the district manager for Union National Life, testified that the victim told him that his mistress' husband, Shane Dietz, might try to have him fired.

As for their financial situation, Defendant-Davis stated that her account was overdrawn by almost $800.00, that her house note had not been paid since March, and that they had no car insurance. Defendant-Davis also stated that she thought the victim gambled more than she was aware. Julius Oaties with Union National Life Insurance testified that both Defendant-Davis and Defendant-Saltzman worked for Union National at one time. Defendant-Saltzman was terminated in March of 2009, and Defendant-Davis was terminated one week later. Despite their financial situation, Darrell Pettifer of Jerry's Marine testified that on the day of his murder, the victim was looking at a $30,000.00 boat. The victim told Mr. Pettifer that he planned to pay for the boat with a settlement or lump sum of cash that he was getting in the near future.

After Defendant-Davis' July 9th statement and before her July 13th statement, Detective Young became concerned with information he learned from Defendant-Davis' cell phone records. A call made by Defendant-Davis at 3:50 p.m. "pinged"

8

off of a tower on Elliot Road in Lake Charles. According to Detective Young, the tower is south of the area in which Defendant-Davis claimed to have been running errands.[3]

In her next statement to police on July 13, 2009, Defendant-Davis repeated much of the same information given in her previous statements but added information about Defendant-Saltzman's use of the victim's Honda Accord. Defendant-Davis explained that the victim's Honda Accord was not at the house the morning of the murder because Defendant-Saltzman drove it home the night before when her car would not start because she left her lights on. On the morning of the murder, while the victim was at work, Defendant-Davis jumped Defendant-Saltzman's car off so that Defendant-Davis could drive to the drugstore. According to Detective Young, Defendant-Davis said she called Defendant-Saltzman to tell her the Jetta was "good" and that she could come pick it up. According to Defendant-Davis, Defendant-Saltzman picked up the Jetta and left the Accord at their house while Defendant-Davis and the victim were boat shopping. Defendant-Davis reiterated that that she and the victim split ways between 2:30 and 3:00 the afternoon of the murder. Defendant-Davis talked to the victim about 3:00 while driving to Defendant-Saltzman's house. Defendant-Davis had to wait for Defendant-Saltzman to get ready. The two then went to the cleaners, Albertson's, and back to the Davis residence.

When told by Detective Young that her cell phone was being used in the area of the victim's murder, Defendant-Davis stated that she was not there. In fact, she stated that she had never been in the area where the murder occurred until after

---

[3]Detective Young did not testify that this call was made on the day of the murder. It is clear from his testimony as a whole, however, that it was made that day.

the victim's body had been found. Defendant-Davis had no explanation for her cell phone being used in the area of the victim's murder.

Defendant-Saltzman also gave a statement to detectives on July 13, 2009. Defendant-Saltzman stated that she was at the Davis home all afternoon on the day before the murder, which was a Sunday. When Defendant-Saltzman started to leave around midnight, her car would not start. Defendant-Davis told Defendant-Saltzman to take the victim's Honda Accord since the victim would be driving Defendant-Davis' Trailblazer to work the next morning. The next morning, Monday, Defendant-Davis called Defendant-Saltzman to tell her that the victim would be needing the Honda Accord. Defendant-Saltzman put $5.00 to $10.00 worth of gas in the car and drove it to the Davis residence. According to Detective Blanchard, a video from Shop Rite showed Defendant-Saltzman at the store shortly after 11:00 p.m. According to Defendant-Saltzman, she drove the Honda Accord to the Davis residence, and Defendant-Davis then drove Defendant-Saltzman back home.[4] Defendant-Saltzman claimed that she stayed home until Defendant-Davis picked her up to run errands later that afternoon. Defendant-Saltzman was not ready when Defendant-Davis arrived, so they did not leave to run errands until an hour later. When the two left Defendant-Saltzman's house, they went straight to the dry cleaners and then to Albertsons. At first, Defendant-Saltzman stated that Defendant-Davis drove while running errands but later remembered that she (Defendant-Saltzman) drove. The two women completed the errands and arrived at the Davis residence around 5:00 or 5:30 p.m.

When the victim was still missing on Tuesday, Defendant-Saltzman drove around looking for him. Because the victim had previously taken them fishing at

---

[4] We note that Defendant-Saltzman's statement about when she returned the Honda Accord is inconsistent with Defendant-Davis's statement that Defendant-Saltzman returned the Honda Accord sometime while Defendant-Davis and the victim were boat shopping.

Calcasieu Point, Defendant-Saltzman drove to Calcasieu Point to look for the victim. When asked what she thought about the fact that Calcasieu Point was close to the murder scene, Defendant-Saltzman replied that she never thought about that. According to Detective Blanchard, the victim's body was found less than a mile from Calcasieu Point Landing.

In a separate interview conducted on that same date (July 13, 2009), Defendant-Saltzman stated that she had previously lived with the Davises for three years. Defendant-Saltzman told Detective Blanchard that she had no knowledge of the victim's death. When Detective Blanchard explained to Defendant-Saltzman the difference between first and second degree murder, Defendant-Saltzman asked if he thought she killed the victim. Detective Blanchard told Defendant-Saltzman that he thought she had either direct or indirect knowledge of the victim's murder. Defendant-Saltzman stated that she did not know what happened and asked to leave the interview. At that point, the interview was concluded.

Stephanie Wells, a good friend who was living with the Davises at the time of the murder, testified that she had eye surgery the day the victim disappeared. Ms. Wells testified that she remembered seeing Defendant-Saltzman's car parked in the grass when she left for surgery. When Ms. Wells returned home from her surgery around 10:30 a.m., she did not recall seeing Defendant-Saltzman's car at the Davis residence. Defendant-Davis was at home when Ms. Wells returned home, and the victim arrived a few minutes later. The victim asked Ms. Wells if she would watch his daughter, Bailey, while he and Defendant-Davis went boat shopping. Although Ms. Wells never saw the victim again, Defendant-Davis returned home around 5:00 p.m. Ms. Wells called the victim between 3:00 and 3:30 p.m., but the phone call went to voicemail. At 3:42 p.m., Ms. Wells sent the victim a text message stating that Bailey was not feeling well. Detective Young

11

testified that the victim's cell phone records indicate Ms. Wells tried to call him at 3:42 p.m., and the phone call went straight to voicemail. The voicemail was followed by a text message stating that Bailey was ill. Although Ms. Wells did not receive a call back from the victim, she did receive a call from Defendant-Davis. According to Detective Young, Defendant-Davis called Ms. Wells at 3:50 p.m.. Ms. Wells assumed the victim and Defendant-Davis were still together. Ms. Wells thinks Defendant-Davis told her she was going to run errands. She acknowledged that in her previous statement to police she said that Defendant-Davis told her she was going to pick up Defendant-Saltzman to run some errands. Ms. Wells also acknowledged that Defendant-Davis made this call to her around 3:50 p.m.. Defendant-Davis and Defendant-Saltzman arrived home from running errands around 5:00 or 5:30 p.m.. According to Ms. Wells, Defendant-Davis was very distraught and crying when the officers notified her of the victim's death.

As for the cars at the Davis residence, Ms. Wells testified that when she left that morning for her eye surgery, Defendant-Saltzman's Jetta was parked off to the side of the driveway on the grass. Ms. Wells did not believe the victim's Honda was there when she left. When Ms. Wells returned, however, she believed Defendant-Saltzman's Jetta was gone and the victim's Honda was there. Ms. Wells also testified that after she went inside, she does not know what vehicles were picked up or dropped off.

Kelsey Little, Defendant-Davis' daughter, arrived at the Davis residence around 7:30 the morning of the victim's murder. Kelsey was with her boyfriend and went to sleep until approximately 2:00 p.m.. Kelsey left with her boyfriend and did not arrive back at home until around 9:00 that night. According to Kelsey, Defendant-Davis told her that the victim never came home from work, and no one

could get in touch with him. When the police notified Defendant-Davis of the victim's death, Defendant-Davis was crying and throwing up.

Babette Bartholomew, Defendant-Davis' mother, testified that she deposited $4,000.00 into Defendant-Davis' account around the time of the victim's disappearance. Defendant-Davis told Ms. Bartholomew that she was instructed by police not to use the account since the victim was missing. Ms. Bartholomew stated that she did not know the victim was deceased when Defendant-Davis asked her for the money. When asked if she ever told the police that Defendant-Davis told her the account was frozen because of the death investigation, Ms. Bartholomew stated that if she did, it was because the victim was already dead at the time she was being interviewed. In her statement to police, Ms. Bartholomew stated:

> I deposited $4,000 into a new account for my daughter, Robyn Davis, around the time of the funeral. I don't exactly remember when, but it was after he had died. Robyn said she couldn't use her account or they, detectives, wouldn't let her use the account because they wanted to watch the activity of Robyn's deceased husband's credit card or account as part of the investigation. I don't remember if Robyn told me that the account was frozen, I just assumed that, but I think I told them she said it was frozen.

At trial, Ms. Bartholomew testified that she deposited the money into Defendant-Davis' account before the victim died.

Detective Young testified that Ms. Bartholomew told him and Detective Blanchard that she deposited the money into Defendant-Davis' account because Defendant-Davis said the police froze the account due to the victim's death investigation. At first, this statement did not concern Detective Young. The detective became concerned, however, when he reviewed the financial records and learned that Ms. Bartholomew's deposit was made on July 1, 2009, the same date the victim's body was found.

Fannie Dietz confirmed that she and the victim had had an affair for about one and a half years. The affair ended in March 2009, when Defendant-Davis confronted her about the affair. According to Mrs. Dietz, her husband, Shane, also confronted the victim about the affair. Shane confirmed that he confronted the victim about the affair but denied ever threatening the victim. Mrs. Dietz was questioned by police on July 7th and took the officers to a spot at which she had previously met the victim. Detective Brent Young described the spot as being "off of Henry Pugh Boulevard, which runs off of Big Lake Road near Calcasieu Point landing." According to Detective Blanchard, the victim's body was found less than a mile from Calcasieu Point Landing.

Detective Young testified that Mrs. Dietz's cell phone records showed that she was in the Iota and Crowley area on June 29th. Detective Young also testified that Shane Dietz's phone records showed that he was not in the Lake Charles area on June 29th. However, Detective Young admitted that there was a gap of several hours between phone calls for both Mr. and Mrs. Dietz. Shane Dietz' records showed that he made a phone call at 2:50 p.m. and then received no other calls or texts until he received a text at 10:54 p.m. Likewise, the phone records for Mrs. Dietz show no activity between 9:28 a.m. and 4:56 p.m. According to Detective Blanchard's testimony at trial, Detective Young also spoke with Shane's boss, who verified that Shane was at work on the day of the victim's disappearance.

*Murder Scene*

Matt Vezinot, one of the deputies that responded to the murder scene, testified that the victim's vehicle appeared to have been having tire trouble. The lug nuts were taken off of one of the tires, and the car's spare tire was on the ground. In order to protect the tire from further damage during the towing process, Deputy Vezinot replaced the seemingly damaged tire with the spare. The tire was

14

taken to Southern Tire Mart to be examined for defects. Billy Carnahan, Southern Tire Mart's store manager, testified that he found no defects in the tire. Mr. Carnahan also testified that if a flat tire was driven over the terrain he saw in a photograph shown to him by the State, the tire would have been damaged. On cross-examination, Mr. Carnahan acknowledged that although it does not happen often, new tires will leak if they are not sealed well around the rim. Mr. Carnahan also agreed that there are situations in which a tire can go flat even if there is no damage to the outer part of the tire.

Lynn Miller, with the Southwest Louisiana Crime Lab, was asked to examine fingerprints lifted from the crime scene in the present case. The fingerprints were lifted from the carjack, the windows of the victim's Honda Accord, an iPOD found in the car, the spare tire rim, and the mirror on the sun visor of the Accord. The only fingerprint that Ms. Miller was able to identify was Defendant-Davis' fingerprint on the mirror of the sun visor.

LeAnne Suchanek, also with the Southwest Louisiana Crime Lab, performed a DNA analysis on items recovered from the crime scene. According to Ms. Suchanek, the victim's body was too decomposed to yield a blood sample. Ms. Suchanek explained that the only way to obtain a "known [DNA] profile" from someone is to obtain a sample directly from the person's fluid or cellular material. Ms. Suchanek concluded that DNA found on the victim's belt, on the victim's fingernails, a bottle cap found at the scene, and the victim's driver's license belonged to an unidentified male. In Ms. Suchanek's opinion, the unidentified male was most likely the victim. Ms. Suchanek reached this opinion by examining the victim's left and right fingernails, from which she obtained a single DNA profile. Because the fingernails are an "intimate sample" taken from the victim, Ms. Suchanek expected the victim's DNA to be present. Ms. Suchanek compared

the DNA found on the victim's belt buckle, beer bottle cap and driver's license with the profile obtained from the victim's fingernails and concluded that they were consistent. Finally, Ms. Suchanek testified that she discovered no female DNA on the items recovered from the scene.

*Testimony Regarding Victim's Gun and Weapon Used to Kill Victim*

Jody Baiamonte, an agent with Union National Life Insurance, testified that he knew the victim very well and knew that the victim carried a firearm in his car. Another agent, Robert Konrady, introduced the victim to a shooting club when the victim bought a Springfield automatic pistol and wanted to learn how to shoot better. Mr. Konrady testified that the victim was proficient in firearms and carried a gun in his vehicle. Justin Little, Defendant-Davis' son, testified that the victim always kept a Springfield XD 9-millimeter handgun either on his person or in his car.

Douglas Lancon, accepted as an expert in firearms and tool mark identification and ballistics, examined two projectiles found in the victim's body. According to Mr. Lancon, these two projectiles were fired from the same gun and were characteristic of "Federal's hydroschock design." On cross-examination, Mr. Lancon acknowledged that there are at least eleven manufacturers that could have made the gun that fired these bullets, one of which was Springfield.

*Crime Scene Reconstruction Expert*

Mr. George Schiro testified for the State as an expert in crime scene reconstruction. After reviewing photographs of the crime scene, Mr. Schiro opined that because the victim's Honda Accord was not muddy, the vehicle had to have arrived at the scene before it rained on the day of the murder. The meteorology reports from the Lake Charles Airport indicate that the rain began around 3:45 p.m. on the day of the murder and lasted until about 7:00 that night.

Mr. Schiro also noticed that there was a live round located near the victim's vehicle. This fact, Mr. Schiro opined, may indicate that the person firing the weapon was not familiar with that particular firearm:

> [I]f someone . . . is not familiar with a particular firearm, they may - - if they're not familiar with all the safety functions, they may pull the trigger to try and click and nothing happens and then they'll rack one out and maybe at the time, you know, figure out how some of the safety mechanisms that may be involved

Mr. Schiro further opined that the shooter may have been standing and the victim bending over when the shooter shot the victim in the back. The victim then turned around and was possibly shot again, with the final blow being a shot to his head.

Additionally, Mr. Schiro testified regarding his opinion as to whether the victim was shot with his own gun. In reaching his opinion, Mr. Schiro looked at the information concerning the brand of the live round found at the scene and information concerning the weapon owned by the victim. After looking at this information, Mr. Schiro opined the following:

> The evidence at the scene supports a probability that he may have been shot with his own gun. Given that there's a particular type of ammunition called Hydra-Shoks and, you know, the shootings that I have investigated, you rarely ever see Hydra-Shoks, with the exception of law enforcement personnel and shooting enthusiasts.
>
> I saw photographs of that same type of ammunition at Mr. Davis' house, so I just think that lends more support, and given the fact that the bullets recovered from his body were Hydra-Shoks and the cartridge casings found at the scene were Federal just lends more support to that he may have been shot with his own gun.

On cross-examination, Mr. Schiro acknowledged that he would need to examine the victim's firearm to determine if it was the actual gun that shot the bullets found at the scene. Mr. Schiro agreed that his opinion is limited to the fact that it was probably the victim's gun based on the fact "there were Hydra-Shok rounds - - he had Hydra-Shok rounds found in his possession[.]" Finally, on re-direct, Mr. Schiro testified, "Relatively speaking, among shootings, you very rarely

17

see Hydra-Shok ammunition, again, unless it's usually a shooting enthusiast involved or law enforcement."

Finally, Mr. Schiro rendered an opinion as to whether the crime scene was staged:

> Well, I believe that the whole tire incident was staged, because all the documentation that I examined show that that tire was fairly recently purchased. There were no defects in it. As far as I know, it held its - - its charge of air once it was charged. There appeared to be no defects on it. So, to me, that part of the scene was staged and that someone had to deflate that tire, and I don't know if it was staged for the benefit of the investigators who come out there, you know, and make it look like he was changing a flat tire, or if it may have been for Mr. Davis' benefit to make him think that there was a flat tire associated with this vehicle.

> The other thing is, in addition to that, Mr. Davis had a compressor in the trunk of his car. And I don't know whether or not that compressor was functioning or not, but if the tire was truly flat, instead of changing the tire, you know, perhaps could have used the compressor. So, just the whole thing with the functionality of the tire indicated to me that that portion of the scene was staged.

On cross-examination, Mr. Schiro acknowledged that crime scene contamination can thwart the investigation of a case. The jury had previously heard the testimony of Deputy Roxanne Baumgarten, a registered medical-legal death investigator with the Calcasieu Parish Sheriff's Department, regarding possible contamination of the crime scene in this case. Deputy Baumgarten acknowledged that because there were photographs showing the Honda Accord's trunk open and photographs showing the Honda Accord's trunk closed, someone did not follow the proper protocol, i.e., no touching of the evidence until all photographs and video are taken. Deputy Baumgarten further expressed concern with the fact that Deputy Vezinot took the allegedly defective tire and put it in the trunk of the vehicle. The problem, Deputy Baumgarten recognized, is that anything on the outside of the trunk could have been transferred to the inside of the

trunk. Mr. Schiro agreed that putting the tire in the trunk without individually protecting it was improper.

On cross, Mr. Schiro recognized that the victim's body was found in a secluded area and that the victim's belt was unbuckled and his shoes and a sock were off. Mr. Schiro admitted that the victim could have been getting undressed when he was killed. When asked, however, if his opinion would have been affected by testimony that the victim liked to go to remote areas to have sex with his mistress, Mr. Schiro replied, "No, it wouldn't have affected my opinions, based on what I've, you know, laid out here today."

### *Further Investigation – Walgreens Video*

Based on the fact that Defendant-Davis stated that she went to the drugstore on the morning of the victim's disappearance (June 29th), Detective Young obtained a video from Walgreens Drugstore for June 29th. The video was introduced into evidence and played for the jury. The video shows that at 8:52 on the morning of June 29, 2009, both Defendant-Davis and Defendant-Saltzman entered the store. According to Detective Young, Defendant-Saltzman never mentioned going to the drugstore with Defendant-Davis.

### *Cell Phone Records*

Detective Young testified as to discrepancies he discovered when looking at Defendant-Davis' cell phone records. Although Defendant-Davis told detectives that she called the victim once after they split up, Detective Young testified that Defendant-Davis' phone records showed that from 3:00 p.m. on, Defendant-Davis' first call to the victim was at 5:58 p.m. Detective Young also testified about the phone call from Defendant-Davis to Ms. Wells at 3:50 p.m. on the afternoon of the victim's disappearance. In her statement, Defendant-Davis told the detective that when she made the 3:50 call, she was waiting on Defendant-Saltzman to dry her

hair so that they could go run errands. According to the cell phone records, this call "pinged" off of a Sprint tower located at 7279 Elliot Road. The use of this tower concerned Detective Young, because the tower is south of Country Club Road, when the Defendants claimed they only went to Albertson's and AAA Cleaners. That same tower was used in a two-second phone call made from the victim's phone at 3:44 p.m. p.m. on the 29th. At the beginning of Defendant-Davis' 3:50 p.m. call, the southwest sector of the tower (sector 4), was the portion of the tower being used. During the call, however, the sector being used switched to sector 3 of the same tower, indicating that Defendant-Davis was mobile. In her statement, Defendant-Davis stated that she did not go anywhere that afternoon besides Albertson's and AAA cleaners. A surveillance video from AAA Cleaners verified that both Defendant-Davis and Defendant-Saltzman were at AAA Cleaners at 4:40 p.m..

Detective Young also testified regarding Defendant-Davis' claim that she left lots of voicemails for the victim. According to Detective Young, Defendant-Davis said she called the victim's voicemail "bunches" of times. However, when the victim's voicemail was played for the jury, there were no messages from Defendant-Davis from June 29, 2009, at 2:58 p.m., until July 4, 2009, at 9:20 a.m.

As for Defendant-Saltzman, Detective Young testified that she told him that she was home in the afternoon of June 29th, until she went with Defendant-Davis to run errands. Defendant-Saltzman's cell phone records, however, indicated that a phone call made by Defendant-Saltzman to Defendant-Davis at 1:38 p.m. "pinged" off of Centennial Tower 940 located at 316 Ben Wright Road in Hackberry, Louisiana. According to Detective Young, Hackberry is located south of Sulphur. Detective Young previously testified that there is a Centennial tower located on Irvin Jensen Lane that is approximately 100 yards from Defendant-Saltzman's

20

residence, which is located in Lake Charles. At 2:41 p.m., Defendant-Davis called Defendant-Saltzman, and Defendant-Saltzman's cell phone "pinged" off a Centennial tower located by the airport in south Lake Charles. Then, at 2:49 p.m., Defendant-Saltzman called Defendant-Davis, and Defendant-Saltzman's phone "pinged" off of a Centennial tower in Sweetlake, Louisiana. Finally, Defendant-Saltzman received a call at 3:01 p.m. that initially "pinged" off of the tower near the airport and ended at Irvin Jensen tower near Defendant-Saltzman's residence. Detective Young testified that the final call was from Troy Fletcher to Defendant-Saltzman.

In addition to the Defendants' cell phone activity on the 29th, Detective Young testified as to the Defendants' cell phone activity on Sunday the 28th. According to Detective Young, both Defendants told him that they were at the Davis home sitting by the pool and grilling. However, at 5:00 p.m. on the 28th, Defendant-Davis called Defendant-Saltzman, and Defendant-Saltzman's phone "pinged" off of the Centennial tower located in Hackberry, the preferential tower for a call made from the murder scene. At 6:26 p.m. on that same date, Defendant-Davis called Defendant-Saltzman, and Defendant-Davis' phone "pinged" off of a cell tower located at 2381 Augustus Street in Sulphur, Louisiana. According to Detective Young, the Augustus Street tower is located near Jerry's Marine, the same location at which the victim and Defendant-Davis were seen boat shopping the following day. At 7:31 p.m. on that same date, the victim called Defendant-Davis, and the victim's phone "pinged" off of a tower located on Canal Street near his home. Defendant-Davis, however, "pinged" off of the tower located at 7279 Elliott Road, which is the same tower off of which her 3:50 p.m. call to Ms. Wells "pinged" the following day (June 29th).

*Expert Testimony Regarding Cell Phone and Cell Phone Towers*

Special Agent William Shute of the Federal Bureau of Investigations was introduced by the State as an expert in historical cell site analysis. Agent Shute examined the call detail records of the Defendants and victim, as well as the cell towers themselves, to make sure the towers were in the same condition they were in at the time of the crime. Agent Shute took an engineering cell phone to the tower locations to see if the phone would reselect to that particular cell tower. Agent Shute explained that when a phone is in idle mode, it is constantly "stacking and racking" – meaning "[i]t's taking all the various cell sites that the phone can see and has stacked and racked at the top the one it sees with the clearest signal, the best quality of signal." Agent Shute prepared a power-point presentation to demonstrate the cell towers used as well as the range of the towers. When asked how accurately the circles drawn on his demonstration depict the radio frequency of the towers, Agent Shute responded:

> Well, a cellular signal doesn't have a perfect ending, a perfect circular sort of ending. It looks more like an ameba, if you were to really draw it by using additional equipment. But what this represents is it's the furthest possible distance that the phone was most likely at during that time, by doing testing east and west of the tower, and when the phone that I used to test with would drop the Centennial Wireless signal from that tower.
>
> Again, when your phone is stacking and racking, it puts that cell site to the top of the list so that if it's about to make a phone call or receive a phone call, that's the cell site that the call gets originated on, the call gets set up on. Outside of that area, the call was not - - or the phone was not reselecting to that cell site. That's why we draw it like this. It's an approximation, and actually it's to actually be fair to the person who actually has the phone, because you have to show, you know, all the possible areas the phone could have been.

In reality, Agent Shute testified, the outside areas could be further away or closer to the cell site. Additionally, Agent Shute explained:

> And, again, is that the exact depiction? No. But it's - - if it's different, it's not that much different than that. Because, again, my phone that I use to test with, this shows where the phone no longer

22

had that signal. And so outside of that area it's very unlikely the phone to reselect to [Tower] 2610.

. . . .

So, you know, in reality the signal probably goes, you know, further and further and further. But the phone would not reselect to it because the phone cannot see it . . . [a]s a clear quality signal.

Using his demonstration to explain his testimony, Agent Shute testified that on June 28th, the day before the murder, Defendant-Davis called Defendant-Saltzman at 5:00 p.m. Defendant-Davis' phone utilized cell tower 3278, which is the tower near the Davis residence in Lake Charles and the preferential cell site at the residence. During that same call, Defendant-Saltzman's phone utilized Centennial Wireless Cell Site 940 located off of Ben Wright Road in Hackberry, which is located south of Sulphur and is the preferential cell tower for a call made from the murder scene. At 6:26 p.m. on June 28th, Defendant-Davis called Defendant-Saltzman, and Defendant-Davis' phone utilized Sprint Tower 3015, the tower near Jerry's Marine, where the victim and Defendant-Davis were seen boat shopping the following day. During that same call, Defendant-Saltzman's phone utilized Centennial Tower 2610, a tower located approximately 370 yards from Defendant-Saltzman's residence. According to Agent Shute, tower 2610 is the serving tower for Defendant-Saltzman's residence. Finally, at 7:31 p.m. on June 28th, Defendant-Davis made a phone call that used cell tower 3045, a tower that covers an area as close as ½ mile from the murder scene.

The following day, June 29th, Defendant-Davis called Defendant-Saltzman just after midnight. Defendant-Davis appeared to be in the vicinity of her residence because her phone utilized cell tower 3278, while Defendant-Saltzman appeared to be at her residence because her phone utilized tower 2610. Relying on the video surveillance at Walgreens, Agent Shute testified that later that morning,

23

both Defendant-Davis and Defendant-Saltzman were together at Walgreens. At about the same time the Defendants were at Walgreens, Defendant-Davis received a phone call, and her phone utilized tower 3278, the same tower used at her residence. According to Agent Shute, Walgreens is in the same coverage area for tower 3278. Notable to Agent Shute was the fact that Defendant-Davis' presence at Walgreens was also supported by the cell site information.

At 11:18 a.m., Defendant-Saltzman is recorded on video at the Shop Rite on Country Club Road in Lake Charles. Defendant-Davis called Defendant-Saltzman at 11:25 a.m., and Defendant-Saltzman's phone utilized tower 2610, the tower near Defendant-Saltzman's home in Lake Charles. Later, at 1:38 p.m., Defendant-Saltzman called Defendant-Davis, and Defendant-Saltzman's phone used tower 940, the tower located in Hackberry, Louisiana, and the preferential tower for a call made from the murder scene. This is the same tower, according to Agent Shute, that Defendant-Saltzman's phone used the previous day. Agent Shute testified that the tower is 300 feet high and actually covers as far out as eight miles. According to Agent Shute, a cell phone used on the access road of the murder scene would utilize this same tower. During the 1:38 p.m. call, Defendant-Davis utilized tower 2273, a tower near Lake Area Marine in Lake Charles, one of the places at which the victim and Defendant-Davis boat-shopped on June 29th.

Approximately one hour later at 2:41 p.m., Defendant-Davis called Defendant-Saltzman. At that time, Defendant-Davis utilized tower 3015, which is the serving cell site for Jerry's Marine in Sulphur. At that time, Defendant-Saltzman had moved from tower 940 in Hackberry to tower 2470 by the Lake Charles airport. For the next thirty minutes (from 2:41 p.m. to 3:08 p.m.), Defendant-Davis had five phone calls, all of which used tower 3015, the serving site for Jerry's Marine. Three of the phone calls were with Defendant-Saltzman.

24

One of the calls (the call at 2:53 p.m.) was with the victim. During this call, both Defendant-Davis and the victim used the same cell tower, 3015. Both Defendant-Davis and the victim were recorded leaving Jerry's Marine at 2:55 p.m. The last call, during which Defendant-Davis' phone used cell tower 3015, was made at 3:08 p.m.

The next call from Defendant-Davis' phone is a 3:50 p.m. call. During this call, Defendant-Davis' phone originated at Sprint tower 4045 and ended 2 minutes and 23 seconds later on Sprint tower 3045. According to Agent Shute, neither tower 4045 nor tower 3045 can be utilized at the murder scene. However, the towers can be used "a half a mile up the road" from the murder scene. Notable to Agent Shute was the fact that Defendant-Davis' phone could have been as close as one-half mile from the crime scene or as far away as five miles. Agent Shute also testified that because the 3:50 p.m. phone call originated on one cell tower and ended on another, Defendant-Davis was mobile during that phone call.

Agent Shute used mapping software and a drive test to find the most direct route from Jerry's Marine to the areas covered by towers 3045 and 4045, the towers used by Defendant-Davis during her 3:50 call. The mapping program and drive testing showed a distance of twenty-one miles and an approximate travel time of twenty-eight minutes. Thus, Agent Shute opined that it was possible for Defendant-Davis and the victim to arrive at the murder scene by 3:36 p.m. Defendant-Davis' phone calls after the 3:50 p.m. call show that she moved a little to the east and then a little to the southeast and then back to the vicinity of her residence. At 4:39 p.m., Defendant-Davis made a phone call that used Sprint tower 2280. Both AAA Cleaners and Albertson's are in the coverage area for that tower. Finally, at 9:36 p.m. on June 29, 2009, Defendant-Davis made a call and Sprint tower 3278, the serving site for her residence, was used.

25

As for the victim's cell phone records, Agent Shute testified that the victim's cell phone was used at 3:01 p.m on the 29th and used tower 3015, the cell site for Jerry's Marine. Then, at 3:44 p.m., the victim's phone made an outbound call lasting only two seconds. The phone used cell tower 3045, the same tower used by Defendant-Davis in her 3:50 p.m. call. Agent Shute noted that Defendant-Davis' cell phone used cell tower 3045 at 7:31 p.m. the day before the murder and at 3:50 p.m. the day of the murder.

On cross-examination, Agent Shute explained that the population of calls on a network has no bearing on the range of the tower. In other words, if the population in an area decreases, the range of a tower will not increase. Agent Shute further explained that although geography could affect the range of a tower, the weather has minimal effect on the range. Although Agent Shute did not agree or disagree with defense counsel, defense counsel noted that on June 28th (the day before the murder), both the victim and Defendant-Davis were using their cell phones in the vicinity of Jerry's Marine between 6:25 p.m. and 6:29 p.m. Additionally, when questioned about the use of multiple cell towers during phone calls that Defendant-Davis made on June 27th within seconds of one another, Agent Shute opined that Defendant-Davis was either mobile or within an area of overlap for those towers.

As for the time it took to get from Jerry's Marine to the murder scene, Agent Shute testified that if a person drove the speed limit, it is possible for that person to reach the crime scene in twenty-eight minutes. If a person drove over the speed limit, of course, that person could arrive sooner. During the cross-examination of Agent Shute, the defense offered documentation showing that a pontoon bridge on the way to the murder scene was opened for barge traffic (and thus closed to road traffic) between 3:31 and 3:47 p.m. on June 29th. Allyson Bailey, a bridge operator

26

with the Department of Transportation and Development, confirmed that the Black Bayou Bridge on Big Lake Road was closed to road traffic from 3:31 p.m. until 3:47 p.m. Agent Shute agreed that if this documentation was accurate, no one could have crossed the bridge between 3:31 p.m. and 3:47 p.m. This fact, Agent Shute acknowledged, was not factored into his analysis.

On re-direct, the following colloquy took place regarding the effect of the bridge opening on the travel time to the murder scene from Jerry's Marine:

Q: All right, Agent Shute. I'd like to draw your attention to prior testimony and this bridge stuff. Now, we didn't have that bridge information, but over the lunch hour I asked you to look at that bridge information, did I not?

A: Yes, on the map. Sure.

Q: Okay. And there was a call in those call detail records, I believe, from Robyn Davis' phone at 3:08?

A: 3:08, yes.

Q: All right. In what sector was that phone call made?

A: Thirty-fifteen.

Q: And which sector is that? Is that the one by Jerry's Marine?

A: Yes.

Q: All right. I want to go back to your fly-over exhibit. Okay. (Addressing assistant.) Can you go to the one that shows the sector? All right. Right there. Okay. That's 3015, correct?

A: Yes.

Q: And that's the one that her phone was on at 3:08?

A: That's correct.

Q: All right. That covers a wide range of area, does it not?

A: Yes.

Q: Okay. So I see I-10 on that - - in that particular sector, correct?

A: Yes.

Q: If that phone made a call at 3:08, could it have been on the outside of the area?

A: You mean towards the outside of the coverage area, out this way?

Q: Oh, yes, sir. That's what I mean.

A: Sure.

Q: Like if someone were going down I-10, say to go back to Lake Charles, it would go all the way back over to where that sector ends, right, - -

A: Out - -

Q: - - or it could?

A: Out this way, yes.

Q: Yes, sir.

A: Sure.

Q: All right. From 3:08, did - - no, scratch that. Back when you said 30 - - no, 28 minutes?

A: Twenty-eight minutes.

Q: That was timed from where?

A: From right here, from Jerry's Marine.

Q: All right. So, there's some time in that 28 minutes that it would have taken to get from Jerry's Marine to the outer edge of that sector, correct?

A: Yeah, using the same mapping software that I utilized when I did this, I checked. And to get from about Jerry's Marine up this road and out on Interstate 10 to about this approximate geographical area would take about six minutes.

Q: Okay. So, the six minutes - - if the call would have came in at 3:08, then it could be at the end? It would be at the end or somewhere in that particular area that you talked of?

A: Well, again, we don't know where the phone was, but if the phone was towards the outskirts of the sector out here on Interstate 10 in this geographical vicinity, sure.

Q: All right. And did you run the mapping software on this area to see from 30 - - I mean, from that particular area how long would it take to get to the murder scene?

A: I believe I checked from the - - that location to being able to get beyond the pontoon bridge.

Q: Okay. And what was that?

A: Twenty-two minutes.

Q: Okay.

A: Going the speed limit.

Q: So if at 3:08 you turned that way and you added 22 minutes, that gets you there at 3:30?

A: 3:30.

Q: Prior to the time that pontoon bridge opens?

A: It is possible, if going the speed limit, you could have gotten there before the - - before the bridge opened. Now, if you were going faster, then you could - - even five minutes, five miles an hour over the speed limit, you could have gotten there a lot - - a lot sooner than the bridge opening.

Q: So, having this bridge opening really doesn't affect your opinion, does it?

A: No. It doesn't mean anything.

As for the two-second call made from the victim's phone at 3:44 p.m., Agent Shute testified that that call could have been a "pocket dial," a misdial with a quick hang-up, a phone call that quickly lost signal, or any number of things. When asked if the phone could have been thrown into water while it was on, Agent Shute replied, "If the phone was connected to - - for a signal and then dropped into the water or thrown into the water, the call signal would terminate immediately." Agent Shute testified that he did not believe the victim's cell phone was found at the crime scene. Finally, Agent Shute opined how long it would take for a person to travel from the murder scene to the AAA Cleaners and Albertson's in Lake

Charles. Agent Shute opined that the drive time was approximately twenty-three minutes. Noting that the Defendants were seen at AAA Cleaners at 4:22 p.m., Agent Shute testified that there was enough time for the Defendants to make it from the crime scene to the cleaners if they were traveling at 3:50.

In its case in chief, the defense offered its own communications expert, John Minor. Mr. Minor opined that Agent Shute's report was biased in several areas. Mr. Minor testified that "cell sites or cellular antennae range from 100-meter coverage in what's called a picocell in a shopping mall to over several thousand meters." Coverage on an interstate, Mr. Minor testified, could be up to forty miles. When asked to explain the difference between live tracking and historical cell site analysis, Mr. Minor stated that live tracking is highly accurate. According to Mr. Minor, in live tracking, other location techniques are used. The accuracy of the location technology used in this case, historical cell sector analysis, was explained by Mr. Minor as follows:

> Well, the accuracy of this technology is based upon the radiation footprint of the cell site. So, you have a cell site in some cases that have a capability to communicate at perhaps, as that Hackberry tower, so-called, at 8, 12 miles perhaps, and maybe on an interstate highway, a cellular tower may be communicating at 20 or 30 miles.

> In town in a suburban or more and more densely urban area, the cell sites are closer together, and so the radiation footprint becomes smaller. So, the actual working range of the cell site becomes smaller. So, this thousand meters plus is just a number. It could be - - it could actually be lower than that, if it were a piocell - - one of the little cells inside a shopping mall, for example. It might be accurate within a hundred yards. But in this case we're talking about cell sites that range from basically about 2 miles - - just thinking about the arrangement here in town, probably 1 to 2 miles out to 10 to 15 miles working range and accuracy.

Mr. Minor disagreed with Agent Shute that the cell phone controls which tower it uses. According to Mr. Minor, the carrier network, not the phone, determines the cell site to which the phone registers. Mr. Minor explained further:

> Well, the neighbor cells concept is, I think as Special Agent Shute described, some stacking and racking. Your cell phone actually monitors and remonitors every 6 to 12 seconds the visible radio signal from cell sites in the vicinity around your handset. When you switch on your handset, it immediately begins to gather information and will register to the highest quality signal that it can locate that the carrier network will allow it to.

Although a cell phone typically attempts to seek the strongest or best quality signal in most instances, there are many factors that will affect how the cell phone actually registers on the network. Thus, Mr. Minor stated, it is "not always a sure thing that your handset will register to the nearest cell site or strongest signal." Some of the factors that could affect the cell site to which the handset registers are "heavy traffic loading," "network operating conditions, cell site maintenance," "radio frequency in use," "antenna array configuration," "geography and topographical features," and "interference factors." According to Mr. Minor, Agent Shute did not consider some of these factors in his report. In fact, no maintenance records were obtained in this case. Thus, there is no indication in Agent Shute's report that he consulted the maintenance records "to know whether or not the system was the same the day he performed the test as it was whenever these cell data records he looked at were generated."

Mr. Minor also disagreed with Agent Shute that weather is not a factor that should be considered. Weather, Mr. Minor testified, affects the "network operating condition." For example, cellular networks can experience "rain fade" during heavy rain storms, causing the signal to fail to propagate through the rain. The person using the cell phone would not notice, however, because the cell phone will reselect to another tower. According to Mr. Minor, lightening can also cause tremendous problems. Finally, Mr. Minor explained what happens when a cell site experiences problems:

[I]f some or many of the cell sites were experiencing outages, either one sector or an entire site blinking out, the network would expand to fill the voids, and the working range would extend, and your handset might actually be in another geolocation.

Mr. Minor also testified that if the population in an area decreases because of a hurricane, for example, fewer subscribers will be in a geographical area, resulting in less of a load on that segment of the network. In Mr. Minor's opinion, the working range of the Hackberry tower extended ten to twelve miles rather than the eight miles estimated by Agent Shute. Mr. Minor testified that it is entirely possible for someone to be on the outer edge of the twelve mile range and have the Hackberry tower pick up his cell phone call. Mr. Minor further testified that a shift change at one of the refineries along Big Lake Road could cause a surge in call traffic. Such a surge could cause a tower to be used that would normally not be used. Thus, Mr. Minor stated, just because a phone "pings" off of the tower in Hackberry does not mean the person is in Hackberry.

The airport tower, Mr. Minor testified, is a little over twelve miles from the Hackberry tower. The Hackberry tower frequencies, Mr. Minor testified, actually reach the airport tower. Thus, Mr. Minor opined, someone could be south of the Country Club Road area in South Lake Charles and still be picked up by the Hackberry tower depending on certain conditions. Mr. Minor testified that it is possible that Defendant-Saltzman might have "pinged" off of the Hackberry tower even though she was far north of where Agent Shute estimated her to be. Additionally, Mr. Minor testified that when looking at the accurate facts from the tower areas, a more possible explanation would be that Defendant-Davis was in her own neighborhood when she made the 3:50 p.m. call. Furthermore, Mr. Minor testified, Mr. Shute's theories were "really . . . mess[ed] up" by the fact that the

32

road was shut down for sixteen minutes by the opening of the pontoon bridge. Finally, Mr. Minor concluded that this type of analysis is a "very inexact process."

On cross-examination, Mr. Minor testified that he did not perform any testing himself. Mr. Minor also testified that he did not know whether a shift change actually took place at the plants on Big Lake Road. Additionally, Mr. Minor did not know whether there were any problems with the networks when this crime occurred nor what type of cell-site maintenance was transpiring. As for his testimony that Tower 940's coverage extends twelve miles, Mr. Minor testified that he did not go out and test or measure anything. Thus, his testimony is simply an estimate. Finally, Mr. Minor testified that he has no idea of the population in Hackberry, Lake Charles, or Sulphur.

### *Background Information About Victim and Defendants*

Justin Little, Defendant-Davis' son, knew of the victim's affair with Fannie Dietz because Justin worked with the victim for Union National in Lafayette. According to Justin, the victim would stop to play video poker on the way to work in the mornings and sometimes on the way home. The victim's video poker playing, Justin testified, escalated in the six months prior to his death. Justin knew that his mom, Defendant-Davis, also gambled. John Nelson, an employee of KD's Diner in Lake Charles, recognized Defendant-Davis as being a continual customer at the video poker machines in the few days preceding July 11, 2009.

Justin also testified that Defendant-Davis was married to Justin's dad, Andrew Little, when Andrew died in a car accident in 2008. Andrew and Defendant-Davis had been separated since 2000, but Defendant-Davis stayed legally married to Andrew so that she could continue to carry Andrew on her medical insurance. According to Justin, Andrew could not work because of a bad back, and it would have been almost impossible for him to obtain medical

insurance. Justin knew that Defendant-Davis carried life insurance on Andrew, but Justin did not know the value of the policies or what happened to the money from the policies. Finally, Justin was asked about a recorded conversation he had with Defendant-Davis while Defendant-Davis was in jail. The recording was later admitted into evidence and played for the jury. During the conversation, Defendant-Davis told Justin that there were people in jail with "way higher bonds" than her that didn't even kill anybody. When asked about the context of that statement, Justin explained:

> We talked about me getting a haircut, a few other, you know, small things, and then I asked her if - - I asked her if anybody had a higher bond than her and I also asked her jokingly if she was the hardest criminal in jail, which we can look at her and make that assessment, and I believe - - you know, it was all in good fun and stuff and we were joking and she said, well - - I believe she said to the extent that they got people with higher bonds that didn't kill anybody, which we were just talking about her arrest. We weren't talking about, you know, her actually doing anything or to that extent.

Justin testified that Defendant-Davis jokingly made the statement and was not confessing to murder. Justin stated that he asked his mother "straight up" if she had anything to do with the victim's murder, and she said "no."

Defendant-Davis' daughter, Kelsey, was asked about her father, Andrew Little's, death. When asked if she ever indicated to police that there was a problem with the life insurance, Kelsey replied, "The problem? That she was the beneficiary and she got all the money." Kelsey also told police that Defendant-Davis told her that there was only $25,000.00 in life insurance. However, when her father's house was being cleaned, a $100,000.00 policy was found. In her statement, Kelsey also stated that the situation was "shady" because Defendant-Davis bought a Trailblazer with cash, bought the victim a boat with cash, remodeled the house with new hardwood floors, bought new kitchen appliances, hired a professional painter to paint the entire house, and hired someone to

34

landscape the house. In the statement, Kelsey described her mother as being unfair to other people. When questioned by defense counsel, Kelsey stated that she did not know how much life insurance money was paid when her dad died.

As for Defendant-Saltzman, Kelsey described her as a second mom. Kelsey stated that Defendant-Saltzman lived with them for four years, never paying any rent or buying groceries. In her statement to police, Kelsey stated that Defendant-Saltzman did not have any money and did not have to have any money if she hung out with Defendant-Davis.

## *Davis' Financial Records*

Detective Young reviewed the Davis' financial records. The District Attorney asked Detective Young to look at withdrawals and expenditures beginning in February 2009. The records showed overdraft charges, frequent withdrawals, and withdrawals at gaming establishments. In particular, on July 10, 2009, Defendant-Davis' card was used to purchase $102.75 at Casino Gaming. On July 11, 2009 (ten days after the victim's body was found), Defendant-Davis wrote four checks at K.D's Diner - $202.75, $102.75, $102.75, and $62.75.

## *Life Insurance*

When he first spoke with Defendant-Davis, Detective Blanchard learned that the victim had two life insurance policies – one from Farm Bureau in the amount of $90,000.00 and one from Union National in the amount of $40,000.00. Later, however, Detective Blanchard learned from Kay Ashworth, of State Farm Insurance, that there were two additional polices - one in the amount of $100,000.00 and one in the amount of $250,000.00. The Farm Bureau policy was opened on September 30, 2004. Defendant-Davis was listed as a fiancé with a scheduled wedding date of December 18th. The $250,000.00 State Farm policy was opened on April 8, 2005, with Defendant-Davis listed as fiancé. Defendant-

35

Davis became the owner of this policy on August 10, 2006. The $100,000.00 State Farm policy was opened on September 30, 2004, and Defendant-Davis was the beneficiary, listed as a girlfriend. The Union National Insurance Policy was a Prudential Policy opened October 29, 2004, in the amount of $50,000.00 with an additional $150,000.00 accidental. The spouse, Marla, was removed, and Defendant-Davis was added as a beneficiary, listed as a friend. Detective Young testified that there were four policies, totaling $645,000.00.

*Defense's Case*

In its case in chief, the defense offered the testimony of John Bloxom, a resident of Calcasieu Parish, who called Crime Stoppers after seeing a news report that a body was found at the end of Wagon Wheel Road on July 1, 2009. The day before the news report, Mr. Bloxom saw a red truck backed up by the trees on Wagon Wheel Road. Mr. Bloxom testified that he saw the truck before noon. Shane Dietz testified at trial that at the time of the murder, he drove a red F-150 four-door truck. When asked if he noticed anything unusual about the truck he saw, Mr. Bloxom stated that the doors of the truck were open. Mr. Bloxom also testified that he had been fishing in that area for twenty years and very seldom saw vehicles in that area. No one from law enforcement followed up with Mr. Bloxom. When asked why he did not follow-up on Mr. Bloxom's call, Detective Young testified that the victim's phone records indicated he was most likely dead on Monday.

Mark Fontenot, a friend of both the victim and Defendant-Davis, testified that he spoke with the victim on the morning of June 29th. Mr. Fontenot thought he remembered the victim telling him that he and Defendant-Davis were looking at boats at Henderson Implement in Welsh. Mr. Fontenot believed the call was at about 10:19 that morning. According to Mr. Fontenot, Defendant-Davis called

him that evening, "around 7:00-ish," to see if he had heard from the victim. Mr. Fontenot stated that he had not heard from the victim, but he began calling the victim and leaving voicemails. When he learned that the victim was missing, Mr. Fontenot thought the victim was either fooling around and did not want to be disturbed or something bad had happened. On cross-examination by the State, Mr. Fontenot described the victim as a "neat freak." Finally, Mr. Fontenot stated that when he and the victim would fish together, they would mostly launch at Calcasieu Point on Henry Pugh Boulevard. According to Detective Blanchard, the victim's body was found less than a mile from Calcasieu Point Landing.

*State's Argument*

In closing, the State argued that instead of being home the afternoon of June 29th as she claimed, Defendant-Saltzman was driving the victim's Honda Accord and communicating with Defendant-Davis to determine when Defendant-Davis and the victim would be leaving Jerry's Marine. Defendant-Saltzman drove the victim's Honda Accord to Wagon Wheel Road and feigned a flat tire. Rather than going home and switching cars as Defendant-Davis claimed, the State argued that Defendant-Davis and the victim drove the Trailblazer straight from Jerry's Marine to Wagon Wheel Road. Although the State does not indicate which Defendant did the shooting, the State argued that once lured to the murder scene, the victim was murdered by the Defendants.

The State argued that the jury must either believe that Defendant-Davis and the victim went home to switch cars as Defendant-Davis claimed, or they must believe that Defendant-Davis and the victim drove straight to Wagon Wheel Road. Traveling the direct and less timely route, the State argued, made more sense in light of the pontoon bridge closing to traffic and in light of the fact that the Honda Accord had to be parked on Wagon Wheel Road before the heavy rains started.

37

The weather reports indicate that heavy rain occurred between 3:00 and 4:00 p.m. Because no mud was found underneath the Honda Accord, it had to have been parked on Wagon Wheel Road before the rain started. Additionally, the State argued that it would have taken less time for Defendant-Davis and the victim to travel directly from Jerry's Marine to Wagon Wheel Road than it would have taken them to travel from Jerry's Marine to their house, switch cars, and then the victim travel alone to Wagon Wheel Road. The Defendants' cell phone records, the State argued, also support its theory. The cell phone records not only show that the Defendants were not where they claimed to be the day before the murder and the afternoon of the murder, they also placed the Defendants near the murder scene both the day before the murder and the day of the murder.

As a further connection of Defendant-Davis to the murder scene, the State argued that the projectiles found at the scene matched the ammunition found at the Davis residence. This particular type of ammunition is not used that often, but is common to law enforcement and gun enthusiasts. The State further noted that the flat tire at the crime scene appeared to be staged.

The State stressed the fact that Defendant-Davis and Defendant-Saltzman gave inconsistent stories as to how and when the victim's Honda Accord was returned to the Davis residence. Additionally, neither woman told police that they were together at Walgreens the morning of the murder. Defendant-Davis also lied to police about leaving the victim numerous voicemails when he did not return home. Additionally, the State pointed out the fact that Defendant-Davis told the victim's sister that the victim never returned home from his trip to Kroger to buy Bailey a Sprite. Although not argued by the State, we also note that Kelsey Little, Defendant-Davis' daughter, testified that Defendant-Davis told her that the victim never returned home from work. These all differ from what Defendant-Davis told

police, that the victim never returned when they went their separate ways for him to continue boat shopping in Beaumont.

To prove motive, the State argued that Defendant-Davis knew the victim had been having an affair with Fannie Dietz. The State also pointed out the financial bind Defendant-Davis was in because of her loss of job, overdrawn bank account, video-poker playing, and late house-note payment. In addition, the State pointed out, Defendant-Davis lied to police regarding the amount of life insurance carried by the victim. In brief, the State argues that Defendant-Davis and Defendant-Saltzman have been nearly inseparable friends for years, that both Defendants were frequent gamblers, and that Defendant-Saltzman was financially dependent on Defendant-Davis.

As further indications of the Defendants' guilt, the State pointed out that Defendant-Davis was out playing video poker just days after her husband's death and that Defendant-Davis asked her mother to deposit $4,000.00 into her account because of the victim's death investigation before the victim was even found. Finally, the State argued that the two Defendants were alibis for one another.

*Defense Argument*

Defendant-Davis acknowledges that although very close, there appears to have been enough time for Defendant-Davis and the victim to drive from Sulphur, clear the pontoon bridge before 3:31 p.m., arrive at the murder scene before 3:36 p.m., and the victim be murdered before 3:45 p.m. However, Defendant-Davis argues that the State's theory does not account for the fact that the victim's cell phone was north of the pontoon bridge at 3:44 p.m. – a period of time when the bridge was closed to traffic:

> It was not possible for the phone to have made its way from the murder scene after the killing of Brian Davis, and be **north** of the pontoon bridge at 3:44 p.m. because the bridge was closed to traffic.

39

**If the cell phone analysis is given credibility enough to convict two people of murder, it should also be considered reliable enough to show that the State's timeline was flawed to the exclusion of every reasonable hypothesis.** Simply put, *there was not sufficient time for Brian Davis to have been murdered during the time frame that the state revealed in its rebuttal argument and still give credence to the cell tower analysis which places his phone north of the waterway at 3:44 p.m.*

However, the State's cell phone expert, Agent Shute, did not testify that the victim's cell *phone* was located north of the pontoon bridge at 3:44 p.m. Agent Shute testified that the cell *tower* used by the victim's cell phone during the 3:44 p.m. call "sits north of the . . . murder scene." Even so, Agent Shute was able to get a signal "just south of the pontoon bridge," making it possible for the victim's phone to have been "within a half a mile of the murder scene." According to Detective Young, Hackberry is located south of Sulphur. Thus, if the victim and Defendant-Davis were traveling from Jerry's Marine (located in Sulphur) to the murder scene, they were traveling south. Agent Shute agreed that the victim and Defendant-Davis had to get beyond the pontoon bridge to reach the murder scene. The murder scene was located south of the pontoon bridge. Consequently, if the murder scene was located south of the pontoon bridge and Agent Shute was able to get a signal "just south of the pontoon bridge," the victim's cell phone could have also been south of the pontoon bridge when the 3:44 p.m. phone call was made.

The Defendants attempt to poke additional holes in the State's case by pointing out that the victim's time of death was not precise and could have been anytime in the afternoon or night of his disappearance, even possibly the morning after. Dr. Terry Welke, the coroner for Calcasieu Parish, estimated the victim's time of death to be sometime after 12:00 p.m. on June 29, 2009. Additionally, the Defendants argue that the testimony regarding the start of rainfall was based on information from the Lake Charles Memorial Airport, a different location than the

murder. Thus, the Defendants argue, the rainfall at the murder scene could have been later.

Defendant-Davis also argues that Shane Dietz, the husband of the victim's mistress, had both the motive and opportunity to kill the victim. Even though Detective Young testified that Mr. Dietz' cell phone records cleared him as a suspect, the Defendant argues that it was impossible for Mr. Dietz to be cleared by his cell phone records since there is a large gap between calls on the day the victim was murdered. Additionally, she argues that the same type of truck driven by Mr. Dietz was seen near the murder scene the day after the victim was murdered. In closing argument, both Defendants also argued that when Defendant-Davis left Jerry's Marine, she was dressed in white capri pants and flip flops, attire not appropriate for going into a muddy cow pasture and killing someone.

Finally, the Defendant raises additional hypotheses of innocence:

> Was Brian Davis going to engage in some monetary transaction that was illegal on the day of his demise? Was he killed in a drug deal gone bad? Was Brian Davis engaged in sexual conduct when he was caught by a jealous husband or boyfriend and killed? Did Brian Davis drive his car to Wagon Wheel Road, leave it parked there, and leave in another vehicle belonging to someone else?

*Sufficiency of the Evidence Analysis*

Both Defendants were convicted of second degree murder, which requires proof that the defendant killed a human being (1) with the specific intent to kill or inflict great bodily harm or (2) while engaged in the perpetration of an enumerated offense. La.R.S. 14:30.1. This court has held that pointing a gun at a person and firing the gun is an indication of intent to kill that person. *State v. Thomas*, 10-269 (La.App. 3 Cir. 10/6/10), 48 So.3d 1210, *writ denied*, 10-2527 (La. 4/1/11), 60 So.3d 1248, *cert. denied*, ___ U.S. ___, 132 S.Ct. 196 (2011). The victim in this

41

case died of four gunshot wounds, one to the head and three to the torso. Thus, the evidence was sufficient to establish a specific intent to kill the victim.

The only issue in this case is whether the victim was murdered by the Defendants. It is well-settled that "[a]s a general matter, when the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification." *State v. Neal*, 00-674, p. 11 (La. 6/29/01), 796 So.2d 649, 658, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323 (2002) (citing *State v. Smith*, 430 So.2d 31 (La.1983); *State v. Brady*, 414 So.2d 364 (La.1982); *State v. Long*, 408 So.2d 1221 (La.1982)).

"Generally, direct evidence consists of testimony from a witness who actually saw or heard an occurrence, proof of the existence of which is at issue." *State v. Jones*, 46,758, 46,759, p. 11 (La.App. 2 Cir. 12/14/11), 81 So.3d 236, 243-44, *writ denied*, 12-147 (La. 5/4/12), 88 So.3d 462 (citing *State v. Lilly*, 468 So.2d 1154 (La.1985)). "Circumstantial evidence, by contrast, consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience." *Id.* at 244 (citing *Lilly*, 468 So.2d 1154, and *State v. Bounds*, 38,330 (La.App. 2 Cir. 5/12/04), 873 So.2d 901). "When circumstantial evidence forms the basis of the conviction, such evidence must exclude every reasonable hypothesis of innocence." *Id.* (citing La.R.S. 15:438).

In the present case, direct evidence placed Defendant-Davis with the victim shortly before the murder. Direct evidence also showed that Defendant-Davis was the beneficiary of over $645,000.00 in life insurance proceeds, that Defendant-Davis knew that the victim had an affair, and that both Defendant-Davis and Defendant-Saltzman lost their jobs. There was also direct evidence from both

42

Defendant-Davis and Defendant-Saltzman as to their whereabouts on the day before the murder and the day of the murder, as well as surveillance video of the Defendants' whereabouts throughout the day of the murder. The jury heard this evidence and, thus, heard the inconsistencies in the two women's stories – i.e., the jury saw the Walgreens video showing both Defendants at the store the morning of the murder; the jury heard Defendant-Davis state that she went to Walgreens with no mention of Defendant-Saltzman; the jury heard Defendant-Saltzman make no mention of going to Walgreens; and the jury heard the different stories by both Defendants as to how the Honda Accord was returned to the Davis residence. The jury also heard direct evidence from the victim's sister that Defendant-Davis told her that the victim never returned home from going to Kroger to get a Sprite for Bailey as well as direct evidence from Kelsey Little that Defendant-Davis told her that the victim never returned home from work. Finally, the jury heard direct evidence that the Honda Accord's tire was not defective.

The jury also heard evidence in this case regarding the estimated time of the murder, evidence of when the victim and Defendant-Davis left Jerry's Marine and how long it would have taken them to get to the murder scene, evidence of the rainy weather near the time of the murder, evidence that the Honda Accord had no mud on it and, thus, had to arrive at the scene before the rain. Moreover, the jury heard evidence that Hydra-Shock ammunition was found at the murder scene and at the victim's residence, evidence that both Defendants were using cell phones near the murder scene both the day before the murder and the day of the murder, and evidence that the cell phones of both Defendants placed them in areas inconsistent with where they claimed to be both the day before the murder and the day of the murder. Additionally, the jury heard evidence of the Defendants' close friendship and that Defendant-Saltzman relies financially upon Defendant-Davis.

43

Finally, the jury heard evidence that Defendant-Davis' mother stated that she deposited the money into Defendant-Davis' account because Defendant-Davis said the police froze the account due to the victim's death investigation when Bartholomew's deposit was made on the morning of July 1, 2009, the same date the victim's body was found.

As for the Defendants' hypotheses of innocence, the jury heard the statements of both Defendants as to their whereabouts the day before the murder and the day of the murder. The jury also heard the testimony of the Defendants' cell phone expert that the Defendants could still be where they said they were and make cell phone calls using towers near the murder scene. Further, the jury heard the testimony regarding the victim's affair with Fannie Dietz, the cell phone records of both Fannie Dietz and her husband, as well as the testimony that a truck similar to Mr. Dietz's was seen near the murder scene the day after the murder. Finally, the jury heard the State's expert testify that unidentified male DNA was found at the murder scene but no female DNA. Nevertheless, the jury rejected the Defendants' hypotheses of innocence.

As this court has held, "when a jury 'reasonably rejects the hypothesis of innocence presented by the defendant[], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt.'" *Francis*, 111 So.3d at 533 (*quoting State v. Strother*, 09-2357, pp. 10-11 (La. 10/22/10), 49 So.3d 372, 378, *quoting State v. Captville*, 448 So.2d 676, 680 (La.1984)) (alteration in original). Accordingly, we find that considering the direct and circumstantial evidence in this case, the jury reasonably rejected the Defendants' hypotheses of innocence, including any possibility that someone other than the Defendants committed the murder.

In a somewhat similar case, the second circuit found sufficient evidence of second degree murder. In *Jones*, 81 So.3d 236, the second circuit found sufficient evidence to convict Jones even though the direct evidence only placed the victim with Jones' shortly *before* the victim's murder. Circumstantial evidence, however, showed that bullets recovered from Jones' trunk were consistent with those used to shoot the victim, and cell phone records put Jones and the victim together in the area where the victim's body was found. The court held:

> The direct evidence that Lioy [victim #1] left Shreveport with Jones and Ms. Foster [victim #2], coupled with the circumstantial evidence of the cell phone records that put them together in the area where the body was found, and that the bullets found in Jones' trunk were consistent with those that shot Lioy, all support a finding beyond a reasonable doubt that Jones killed Lioy, with a specific intent either to kill or inflict great bodily harm. The suggestion that somebody else might have intervened in this sordid sequence of events and shot Lioy is simply not sufficiently reasonable to dissuade a reasonable jury from its finding of Jones's guilt. This assignment of error lacks merit.

*Id.* at 245.

Likewise, we find that the direct and circumstantial evidence presented in the present case supports a finding beyond a reasonable doubt that Defendant-Davis and Defendant-Saltzman killed the victim with the specific intent to kill or inflict great bodily harm. Louisiana Revised Statutes 14:24 provides, "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." The evidence presented at trial shows that Defendant-Davis was with the victim shortly before the time the State alleges the murder occurred. Defendant-Davis and Defendant-Saltzman were in frequent communication the day before the murder and the day of the murder. Both Defendants gave inconsistent statements as to their whereabouts and the cell phone records of both

Defendants place them near the scene of the murder both the day before and the day of the murder. Although Defendant-Saltzman was not with the victim shortly before the murder as was Defendant-Davis, the cell phone records indicate that Defendant-Saltzman was continually communicating with or was physically with Defendant-Davis both the day before the murder and the day of the murder. On the day of the murder, Defendant-Saltzman was seen with Defendant-Davis that morning, continually communicated with Defendant-Davis throughout the day (even within the hour the State alleges the murder occurred), and was seen with Defendant-Davis shortly after the State alleges the murder was committed. Defendant-Saltzman was also driving the victim's Honda Accord the day of the murder. Finally, Defendant-Davis knew the victim had been having an affair, admitted to being in a financial bind, and stood to benefit financially from life insurance policies. Defendant-Saltzman was a very close friend of Defendant-Davis and had been financially reliant on Defendant-Davis in the past. Considering this evidence, we find that the jury reasonably rejected the Defendants' hypotheses of innocence and convicted them both of second degree murder.

Accordingly, this assignment lacks merit.

**ASSIGNMENT OF ERROR NUMBER ONE:**

In this assignment of error, Defendant-Davis argues that the trial court erred in failing to swear in the jury as required by La.Code Crim.P. art. 790 and then granting the State a continuance after the commencement of trial. For the reasons that follow, we find that this assignment lacks merit.

The case was called for trial on November 7, 2011, at which time jury selection began and continued until a jury was selected on November 10, 2011. Before the conclusion of jury selection, the testimony of one of the State's

46

witnesses, Deputy Baumgarten, was perpetuated. The day after jury selection was completed, November 11, 2011, the State requested a continuance because of the physical health of the prosecutor in the case, Rick Bryant. Over the objections of defense counsel for both Defendants, the trial court granted the continuance. The trial court also refused defense counsels' request to swear in the jury.

Subsequently, on January 6, 2012; January 18, 2012; and January 24, 2012, the trial court heard testimony and argument regarding a motion to quash and dismissal filed by both Defendants. Both Defendants argued that double jeopardy attached when the State perpetuated the testimony of Deputy Baumgarten before the trial court granted the State's continuance based on Mr. Bryant's health. The Defendants also argued that the charges against them should be dismissed because of the prejudice they suffered by the granting of the continuance. The trial court denied the motion to quash and to dismiss the charges.

On February 24, 2012, the Defendants sought review of the trial court's denial of their motion to quash and dismissal of the charges. On March 28, 2012, this court denied the writ application, ruling as follows:

> **WRIT DENIED; STAY DENIED:** Defendants argue error in the trial court's granting of a continuance and that jeopardy had attached and further prosecution would expose them to double jeopardy. Although the trial court stated that it granted a continuance, because it had no legal authority to do so, what was actually granted was a recess. Even though erroneously referred to as a continuance, the court's action must be treated as a recess. *See* La.Code Crim.P. arts. 707, 708, and 761 and *State v. Hedgespeth*, 42,921 (La.App. 2 Cir. 1/9/08), 974 So.2d 150, *writ denied*, 08-467 (La. 10/3/08), 992 So.2d 1008.
>
> Additionally, Defendants argue error in the trial court's denial of their motion to quash, based on the erroneous granting of a continuance, and alleged prejudice resulting therefrom. As no continuance was granted, the motion is rendered moot. If either party continues to believe any prejudice had resulted from the recess, it can be addressed in the trial court.

47

This matter is remanded to the trial court with instructions to proceed with the trial as expeditiously as possible, with the original jury, if such can be accomplished without resulting prejudice to any party. If not, as jeopardy has not attached, a new jury panel shall be called. *See Hedgespeth*, 974 So.2d 150.

Thereafter, on April 18, 2012, the supreme court denied a writ application filed by the Defendants. *Davis and Saltzman*, 85 So.3d 1255.

This court has held that great deference should be afforded to pre-trial decisions:

> Although a defendant may seek review of a pretrial ruling even after a pretrial supervisory writ application is denied, when the defendant does not present any additional evidence on the issue after this pretrial ruling, the issue can be rejected. *State v. Hebert*, 97-1742 (La.App. 3 Cir. 6/3/98), 716 So.2d 63, *writ denied*, 98-1813 (La.11/13/98), 730 So.2d 455, *cert. denied*, 529 U.S. 1072, 120 S.Ct. 1685, 146 L.Ed.2d 492 (2000) (quoting *State v. Magee*, 93-643, p. 2 (La.App. 3 Cir. 10/5/94), 643 So.2d 497, 499). However, "[j]udicial efficiency demands that this court accord great deference to its pre-trial decision unless it is apparent that the determination was patently erroneous and produced unjust results." *Hebert*, 716 So.2d at 68. Our review of the record reveals no additional evidence for the defendant's allegations of prosecutorial misconduct which would support his pretrial motions.

*State v. Perry*, 12-298, p. 7 (La.App. 3 Cir. 11/7/12), 101 So.3d 575, 580, *writ denied*, 12-2657 (La. 5/24/13), 116 So.2d 659 (alteration in original). We find that the Defendants have failed to prove that this court's pre-trial ruling was patently erroneous or produced unjust results. Thus, we abide by our pre-trial decision and refuse to reconsider whether the trial court abused its discretion in granting the continuance/recess.

However, we will address a new argument raised by the Defendants on appeal. The Defendants argue, in their appellate brief, that this court erred in finding the trial court's grant of a continuance was actually the grant of a recess:

> Under the particular facts of this case, the continuance was specifically just that, a postponement without date of the trial that had already commenced. A recess is defined in La.C.Cr.P. Art. 708 as a "temporary adjournment". The instant trial was continued without date for a period that ultimately consisted of five and one-half months

48

and was not in any way a temporary adjournment. Further, it matters not the length of the delay, or the term used to describe the delay, the issue is whether a party is prejudiced by the delay, and if so, the error is reversible. *State v. Hedgspeth*, 42,921 (La.App. 2 Cir. 1/9/08), 974 So.2d 150; *State v. Love*, 00-3347 (La. 5/23/08), 847 So.2d 1198.

According to the Defendants, the trial court's action should have been considered an "illegal dismissal." In making this argument, the Defendants cite *State v. Hedgspeth*, 42,921 (La.App. 2 Cir. 1/9/08), 974 So.2d 150, *writ denied*, 08-467 (La. 10/3/08), 992 So.2d 1008, the case cited by this court in its writ ruling. In *Hedgspeth*, the state moved for a "continuance" after ten of the twelve jurors were selected and sworn. As the reason for the continuance, the state explained that it had been under the impression that DNA testing had been done and the results were inconclusive. The state discovered, however, that DNA testing was never actually performed. The defense objected to the continuance because ten jurors had already been selected. Finding that the DNA evidence was potentially critical evidence to the case, the trial court granted the state's motion and rescheduled trial for approximately three months later. When the trial finally took place, it was before a different trial judge and an entirely new panel of jurors.

On appeal, the second circuit stated the following regarding the appropriateness of a continuance in this situation:

> Here, in order to determine whether the grant of the motion for continuance was proper, we must first determine if the initial trial had "commenced." Louisiana C. Cr. P. art. 761 provides that, "a jury trial commences when the first prospective juror is called for examination." Since it is undisputed that 10 of the 12 prospective jurors had been selected, pursuant to articles 761 and 708 the trial had already commenced. Thus, the trial court was without authority to grant a "continuance," and in effect the action was an illegal dismissal. However, Hedgspeth must show he has been prejudiced by this action, as the dismissal alone does not constitute reversible error. *State v. Love*, 2000-3347 (La.05/23/03), 847 So.2d 1198.

*Id* at 154 (footnote omitted).

Adopting the second circuit's "illegal dismissal" terminology, the Defendants argue that the continuance/recess granted in the present case should have been considered an "illegal dismissal." The Defendants acknowledge, however, that even if the continuance/recess is considered an "illegal dismissal," the Defendants must still show they suffered prejudiced in order for the dismissal to constitute reversible error. Alleging prejudice, Defendant-Davis argues:

> In the instant case, the trial court granted a continuance of trial after **all** of the jurors had been selected and also after the State had started its case by taking testimony from its key crime scene witness and introducing over 20 pieces of evidence into the record. The State was forewarned of serious deficiencies in their investigation during the cross-examination of their lead forensic investigator, Baumgarten, and the continuance allowed them to correct these errors and deficiencies. The delay caused by the wrongful granting of the continuance allowed the State time to correct problems regarding crime scene integrity, to test evidence, interview witnesses, and hire an expert witness to help shore up deficiencies that were made apparent during the first trial. An opportunity afforded them only because of the wrongful granting of the continuance and the delay caused by it.

The Defendants' prejudice argument is very similar to the argument made by the defendant in *Hedgspeth* and rejected by the second circuit:

> On appeal, Hedgspeth complains that as a result of this "continuance" the state was given additional time to prepare for trial and that he was entitled to have his case tried before the jurors already selected. The right to have one's trial completed by a particular tribunal is within the protection of the constitutional guarantee against double jeopardy, since it is that "right" that lies at the foundation of the rule that jeopardy attaches when the whole jury is empaneled and sworn. *Crist v. Bretz*, 437 U.S. 28, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978). However, in the instant case, that "right" had not yet attached when the trial court granted the state's motion and dismissed the partial jury. . . .
>
>     . . . .
>
> Moreover, the public has an interest in affording the state one full and fair opportunity to present its evidence to an impartial jury. *See Illinois v. Somerville*, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973). The right to have one's case tried before the jurors already selected cannot serve as a barrier to full and fair prosecution of the defendant under these particular circumstances. *See State v. Marshall*, 410 So.2d 1116 (La.1982). In the case at hand, since the

jury was not sworn pursuant to La. C. Cr. P. art. 790, nothing prevents the state from pursuing a full and fair prosecution.

Further, we find that the record does not support, nor are we persuaded, that the additional preparation time afforded the state warrants reversal. Had the state moved for and been granted a continuance only a day earlier (prior to the examination of the first prospective juror), or had the trial been originally scheduled for a later date, such actions would not have been an abuse of discretion. The trial judge found that the DNA results were critical to the case because they could essentially exonerate the defendant or provide strong evidence of his guilt. The state explained that the crime lab was backlogged and that the earliest available trial date for the recommenced proceedings would be April 24, 2006, to which defense counsel responded: "That date's agreeable, Your Honor."

In fact, under these circumstances, if the trial court denied the continuance motion, the state could have immediately *nolle prosequied* the charges and reinstituted the prosecution under a separate docket number (which, practically speaking, would have been tried at a later date). In *State v. Albert*, 430 So.2d 1279 (La.App. 1st Cir.1983), *writ denied*, 433 So.2d 711 (La.1983), the prosecutor entered a *nolle prosequi* at a first trial after 6 of 12 jurors had been selected. In *Albert*, the subsequent conviction and sentence were affirmed. In *State v. Payton*, 2006-1202 (La.App. 4th Cir.02/28/07), 954 So.2d 193, the trial court held that the state's failure to timely seek a continuance did not bar reinstitution of the same charges after the prosecutor entered a *nolle prosequi* immediately upon the denial of its motion for a continuance on the day trial was originally set to begin.

*Id.* at 154-55.

Likewise, we find that the present Defendants have failed to show that they were prejudiced by the trial court's grant of the continuance/recess, even if it should have been considered an "illegal dismissal." First, contrary to the Defendants' argument in Assignment of Error Number 4, double jeopardy had not attached when the trial court granted the continuance/recess. *See Davis and Saltzman*, 12-236; *Hedgspeth*, 974 So.2d 150; La.Code Crim.P. arts. 592 and 790. According to La.Code Crim.P. arts. 592 and 790, double jeopardy does not attach in a jury trial until the jury is sworn together to try the case. Second, as she did in her perpetuated testimony, Deputy Baumgarten testified at trial as to how the

51

evidentiary value of the crime scene could have been compromised by police activity in this case. Third, the Defendants actually benefitted by the additional DNA testing performed after the continuance/recess was granted. Ms. Suchanek testified that she discovered no female DNA on the items recovered from the scene. Thus, the Defendants (being females) actually benefited from the fact that more items were tested after the continuance/recess, and no female DNA was found on any of those items.

Finally, we note that the Defendants allege that the remedy for the prejudice they suffered by the delay in trial is a reversal of their convictions and a remand for a new trial. Thus, even if this assignment of error was found to have merit, the remedy requested would allow the State to have yet another chance to retry the Defendants.

In this assignment of error, the Defendants also claim that the trial court erred in refusing to swear the jury in after they were selected. In support, Defendants cite La.Code Crim.P. art. 790, which provides, "When selection of jurors and alternate jurors has been completed, and all issues properly raised under Article 795 have been resolved, the jurors shall then be sworn together to try the case in a just and impartial manner[.]" During the discussion of whether the case would be continued/recessed because of Mr. Bryant's health issues, the Defendants requested the trial judge swear in the jurors selected. The issue of whether the jury would be sworn was discussed in open court. The Defendants made known their desire for the jury to be sworn, and the State made known its desire for the jury not to be sworn in order to protect against the attachment of double jeopardy. The trial court ruled that it would not swear the jury in:

> And I'm not going to swear the jury in. Once the jury is sworn in then jeopardy does attach, and there would be no - - if I did that it would be - - I'm sure if I swore that jury in I'm sure the State would

withdraw its Motion to Continue because they wouldn't be able to retry the case.

On appeal, the Defendants cite no authority for their allegation that the trial court erred in refusing to swear the jury in. Our research finds a similar case out of the fifth circuit – *State v. Tuckson*, 00-1408 (La.App. 5 Cir. 2/28/01), 781 So.2d 807, *writ denied*, 01-1129 (La. 1/25/02), 806 So.2d 671. In *Tuckson*, all of the jurors and two alternates were selected and sworn individually. The state requested that the jury not be sworn together until the following day. The trial court granted the state's request over the defendant's objection. The following day, the state nolle prosequied the charges against the defendant, claiming that double jeopardy had not attached since the jury was not sworn. That same day, the state refiled the charges against the defendant. Although the defendant filed a motion to quash on double jeopardy grounds, the trial court denied the motion. The defendant was subsequently tried and convicted.

On appeal, Tuckson argued that the trial court erred in denying his motion to quash the second bill of information based on double jeopardy. The court of appeal found that since the jury was not sworn pursuant to La.Code Crim.P. art. 790, double jeopardy had not attached. The real issue, the court of appeal stated, was "whether the trial court erred in refusing to swear in the jury '. . . together to try the case . . .' immediately following the selection of the two alternate jurors." *Id.* at 813. Finding no reversible error in the circumstances before it, the court of appeal stated:

> As provided in La.C.Cr.P. art. 795, prior to the jury being sworn together or as a whole, either the defense or the State may still exercise his/its challenges for cause. The defense suffered no prejudice from the trial court's refusal to swear the jury immediately. The decision effected [sic] both the defense and the State in the same way. As a matter of practice, trial court judges will sometimes wait until trial is ready to commence before swearing the jury together or as a whole, just in case of unforeseen events.

53

In a related matter, this Court is concerned with the use by the State of its powers to dismiss charges against a defendant, followed by refiling of those same charges, in order to obtain a continuance of the trial. The ruling in this case might be different if that scenario had been argued and proven. There are other, more appropriate procedural vehicles at the State's disposal when it finds its witnesses are unavailable for trial. For instance, the State might have requested and been granted, if appropriate, a trial continuance. See La.C.Cr.P. arts. 709, 710. However, based on the record before us, we do not find the abuse of discretion that would prevent the trial of this Defendant on the charges filed against him. This assignment of error lacks merit.

*Id.*

Although the Defendants in the present case argue that they were prejudiced by the continuance/recess granted by the trial court, as we have already stated, the Defendants have failed to show prejudice. In addition to the considerations already discussed, the Defendants have also failed to prove that they were prejudiced by the fact that they were not tried before the jurors originally selected. The Defendants fail to allege or point to any indication in the record that the verdict would have been different had the original jurors heard their case. Thus, we find that the trial court's refusal to swear the jury immediately after they were selected does not constitute reversible error in this case.

One final issue that the Defendants mention in this assignment of error is the fact that after granting the continuance, the trial judge personally addressed the jurors off the record, with no counsel present. At the conclusion of the discussion regarding the continuance/recess, the trial judge stated that he was going to visit with the jurors in the jury deliberation room. Without alleging what the trial court spoke to the jury about, the Defendants merely allege that "any private communication with a juror *after trial begins, or is in recess,* is deemed presumptively prejudicial. *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450 (1954); *State v. Sinegal*, 393 So. 2d 684 (La.1981)." The jurors spoken to by the

trial judge in the case were not the jurors that ultimately convicted the Defendants. Therefore, they suffered no prejudice by the trial court speaking with those jurors. Thus, this issue has no merit.

For the foregoing reasons, this assignment has no merit.

## ASSIGNMENTS OF ERROR NUMBERS TWO AND THREE:

The Defendants combine these two assignments of error in their briefs. The Defendants allege that the trial court erred as a matter of law in not finding prejudice and in not granting the Defense's Motion to Quash/Dismiss. As discussed in the previous assignment, the Defendants filed a Motion to Quash Prosecution and for Dismissal of the Indictment with Prejudice. The trial court denied the motion, and the Defendants sought review in this court. On March 28, 2012, this court denied the writ application. In its ruling, this court allowed the Defendants to re-urge prejudice if they still felt it was applicable. Prior to trial, the Defendants did re-urge their prejudice claim, but the trial court denied the motion.

In this assignment, the Defendants basically argue the same prejudice argument raised in the first assignment of error but with more specificity. The Defendants cite *Hedgspeth* for the proposition that an erroneous continuance or recess that causes prejudice constitutes reversible error. First, the Defendants allege that the continuance/recess allowed the State to send additional items to the lab for testing after Deputy Baumgarten's perpetuated testimony revealed the fact that numerous items had not been tested. However, as stated above, the Defendants (being females) actually benefited from the fact that more items were tested after the continuance/recess since no female DNA was found on any of those items.

The Defendants argue further that if not for the continuance/recess, "the State would have lost credibility with the jury when it had to attempt to explain the

severe lapses in its shoddy murder investigation" and the reason why it focused on the Defendants without fully investigating the crime. This was particularly important, the Defendants argue, given the fact that the State's case was entirely circumstantial. By having a second trial, the Defendants argue, "the State has undoubtedly had a second chance to correct its errors to the well-documented and distinct prejudice of the Defendant."

The Defendants point to Deputy Baumgarten's testimony as a specific example of how the State was allowed to correct its errors. According to the Defendants, Deputy Baumgarten acknowledged in her perpetuated testimony that the deputies walked all over the crime scene, and no one knew which footprints were pertinent. Deputy Baumgarten also acknowledged in her perpetuated testimony that the deputies' handling of the tire's lug nuts destroyed the possibility of lifting any fingerprints off of the lug nuts. Without referring to any specific testimony, the Defendants claim that Deputy Baumgarten changed her testimony when she testified live at trial. After reviewing Deputy Baumgarten's perpetuated testimony and her live testimony at trial, there is a slight difference in her testimony regarding the amount of footprints located at the scene. In her perpetuated testimony, Deputy Baumgarten answered "yes" when asked if the number of people walking around the crime scene concerned her. Deputy Baumgarten's trial testimony regarding footprints, however, was not as concrete.

At trial, however, Deputy Baumgarten did testify as to how the evidentiary value of the crime scene could have been compromised by police activity in this case. Deputy Baumgarten agreed with defense counsel that someone at the crime scene did not follow the well-settled protocol that nothing at the crime scene should be touched until photographs are taken. Deputy Baumgarten further testified that she would be concerned if one of the deputies placed the "defective"

tire in the trunk of the Honda Accord, because evidence from outside of the trunk could be transferred to the inside of the trunk. Thus, in her trial testimony, like her perpetuated testimony, Deputy Baumgarten testified as to how police activity may have affected the evidentiary value of the crime scene in this case.

Defendant-Davis further argues:

It is quite apparent that Baumgarten studied the transcript of her videoed trial testimony, and decided to sanitize the damaging admissions of mistakes which Defense counsel elicited during the videoed testimony at the first trial. The State did not use the videoed testimony, but produced Baumgarten live at the second trial, and the Court did not allow mention of the first trial (See App. Rec. Vol. 24, p. 5281, ll. 18-21). The opportunity for the State's key witness to be forearmed with the knowledge of what Defense counsel will ask about, and also repair the damage of her previous testimony, is fundamentally unfair and prejudicial to the Defense. At the second trial, the Defense had to impeach Baumgarten with a transcript of her previously videoed testimony, thus confusing the jury. The Defense should have been able to cross-examine Baumgarten one time and before the jury. Giving the State a second "bite at the apple" severely prejudiced the Defense. Having to have revealed Defense strategy and attorney work-product is also severely prejudicial to the Defense. But for the erroneous continuance, the State would not have this decided trial advantage.

While it may appear that Deputy Baumgarten attempted to "sanitize" some of her perpetuated testimony as to the excessive walking around by police officers at the crime scene, she was clear in her trial testimony regarding other areas in which the crime scene could have been compromised. Furthermore, at trial, defense counsel was able to use Deputy Baumgarten's perpetuated testimony during his cross-examination of Deputy Baumgarten. There is no indication that defense counsel's inability to explain the origin of the prior testimony was confusing to the jury. Additionally, as the State argues in brief, the reason for Deputy Baumgarten's perpetuated testimony at the first trial was her unavailability. Since she was available for the second trial, the State argues it would have been inappropriate to introduce her perpetuated testimony. Thus, the State's offer of

57

Deputy Baumgarten's live testimony does not appear to have been a tactical move to allow her to change her testimony, especially in light of the fact that the continuance/recess was, at the time, undisputedly needed for Mr. Bryant's illness.

The Defendants also complain that the new items tested for DNA revealed unidentified male DNA under the victim's fingernails, on the victim's driver's license, on the victim's belt buckle, and on a Michelob Ultra bottle cap found in the Honda Accord. The Defendants allege that the lab report containing this information was not given to them until the middle of trial, leaving them insufficient time to obtain additional testing. In Ms. Suchanek's opinion, the most likely donor of the DNA was the victim. Ms. Suchanek also testified on cross-examination that the unidentified male DNA could belong to anyone and that no female DNA was discovered at the scene. Considering the inconclusiveness of Ms. Suchanek's testimony regarding the unidentified male DNA found at the scene along with her conclusive testimony that no female DNA was discovered at the scene, the Defendants have failed to show how they were prejudiced by the additional DNA testing performed after the first trial.

As additional prejudice, the Defendants complain that during the first trial, the State was made aware of the defense witnesses, and the continuance/recess afforded the State extra time to find and interview these witnesses. Furthermore, the deputies that contaminated the crime scene were free to coordinate their testimonies with Deputy Baumgarten "to try to repair the obvious damage to the State's case." These general allegations of prejudice are not sufficient to warrant a reversal of the Defendants' convictions. Moreover, the continuance/recess afforded the defense the same opportunity to interview witnesses and develop its case.

Ultimately, the evidence that convicted the Defendants was their inconsistent statements to police and the fact that their cell phone records placed them in the vicinity of the murder both the day before and the day of the murder. This evidence existed at the first and second trials. Thus, we find that the Defendants fail to show that the trial court's grant of a continuance /recess caused them to suffer prejudice sufficient to warrant a reversal in the case.

Accordingly, this assignment lacks merit.

## ASSIGNMENT OF ERROR NUMBER FOUR:

By this assignment of error, the Defendants claim the trial court erred in failing to grant their motion to dismiss on grounds of double jeopardy. Additionally, the Defendants allege that this court erred in its pre-trial writ ruling when it found the motion to dismiss was moot. The State argues that judicial efficiency demands this court to defer to its pre-trial writ ruling finding double jeopardy had not attached in this case. Considering the great deference that should be shown to this court's pre-trial writ ruling and considering the fact that the Defendants raise the same arguments on appeal that they raised in their pre-trial writ application, we find that the Defendants have failed to show that this court's pre-trial ruling was patently erroneous or produced unjust results. Thus, we abide by our pre-trial writ ruling finding double jeopardy did not attach in this case.

We will address, however, an additional argument raised by the Defendants on appeal. The Defendants allege that the trial court's failure to swear the jury when required to do so under La.Code Crim.P. art. 790 and the erroneous dismissal of the jury by the trial court infringed upon the Defendants' constitutional right to that jury. We have previously addressed the Defendants' argument as to the trial court's failure to swear the jury when required to do so under La.Code Crim.P. art. 790 in Assignment of Error Number 1 and found that no error occurred.

59

Furthermore, no constitutional right attached to the jury originally selected because that jury was never "sworn together to try the case." Finally, as noted by the trial court, every effort was made to have the original jury try the Defendants' case. However, after questioning the jurors, the trial court was forced to release three of the jurors based on hardship reasons. Notably, even though the defense continually noted its objection to the entire process, neither side objected to the release of the jurors based on their individual hardships.

For the foregoing reasons, we find that this assignment lacks merit.

## ASSIGNMENT OF ERROR NUMBER FIVE:

By this assignment, the Defendants allege that the trial court erred in failing to require the State to enunciate a theory of the case in its opening statement. The Defendants claim that the State's theory of how the murder was carried out was not revealed until closing and rebuttal argument, prejudicing the defense. For the following reasons, we find no merit to this assignment.

In support of this argument, the Defendants cite La.Code Crim.P. art. 766, which provides:

> The opening statement of the state shall explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the state expects to prove the charge.

In its opening statement in the present case, the State described the condition of the victim's body when it was found and the number of times the victim had been shot. The State also described the area in which the victim's body was found. The State then explained to the jury how the police learned the victim's identity as well as the fact that the victim had been reported missing several days earlier. Information obtained from oral interviews was told to the jury – i.e., the fact that the victim played hooky from work on the day he was killed and went boat shopping with his wife, Defendant-Davis. The State then explained Defendant-

60

Davis' claim that the victim went boat shopping in Beaumont while she stayed home and ran errands with Defendant-Saltzman. Additionally, the State set forth the investigative steps taken by the police after the oral interviews – i.e., talking to various witnesses, traveling to the locations visited by the victim the day of the murder, viewing surveillance video of the boat places visited by the victim, viewing surveillance video of the places at which the Defendants ran errands, and retrieving cell phone records of the victim and both Defendants. Furthermore, the State explained, the police examined bank records and insurance policies, discovering that the victim had almost $700,000.00 worth of life insurance when he died. Through its investigation, the State told the jury, the police also learned that the victim had had an affair with a woman named Fannie Dietz.

The cell phone records, the State told the jury, were the biggest breakthrough. Major inconsistencies, the State argued, were revealed when Defendant-Davis' cell phone records were reviewed. The State explained that a cell phone expert with the FBI would be testifying as to the cell phone record and cell phone towers. Once the inconsistencies were discovered, the State explained to the jury, both Defendants were asked to give statements. Finally, the State told the jury that it felt the jury would find both Defendants guilty once it heard all of the evidence.

After the State gave its opening statement, counsel for Defendant-Davis asked to approach the bench. Counsel argued that the State failed to outline its theory of the case in the opening statement. The State countered that all La.Code Crim.P. art. 766 requires is for the prosecution to state in general terms the nature of the evidence by which the State expects to prove the charge. Defense counsel argued, however, that case law requires the State to put the Defendants on notice of what they are defending against. Although the State told the jury about insurance

and phone calls, defense counsel argued, the State failed to give its theory of how the victim was murdered. The trial judge overruled Defendant-Davis' objection. Defendant-Saltzman noted her objection that they were "still subject to unfair surprise."

In brief, the Defendants argue that the State failed to give an adequate opening statement on two counts:

> First, the lack of stating a theory of the case, and secondly, concealing what evidence the State intended to use to prove the charges. These failures were severely prejudicial to the Defendant, because the Defense had no idea what evidence would actually be used to prove the charged offenses. This hampered effective cross-examination and forced Defense counsel to risk opening the door to issues the State had yet to mention or raise.

Defendant-Davis further argues:

> There was no mention as to how the State would prove the murder was carried out. There was no mention of possible weapons used by the killer or killers, or the number or placement of the shooter(s). There was no mention of any activity at the crime scene, before or after the shooting. There was no mention of anything the crime scene revealed or of any pertinent evidence collected. There was no mention of ballistics testing and what those tests revealed or did not reveal. Other than to state that Bryan Davis was shot four times, the prosecution's opening statement was silent as to the slightest detail as to how the murder was carried out. **The State's opening statement in no way revealed a theory of the case**.

> Not even in the most general of terms was a theory presented, and this allowed the State to vary its prosecution plan and change its theory as it saw fit; waiting until the rebuttal and closing argument to reveal any of their impressions as to how the details of the murder occurred.

> . . . .

> This case was completely circumstantial, and that fact alone demand[ed] some theory as to how the murder occurred, and what role each of the accused played in carrying it out, needed to be addressed in the opening statement. The Defense faced a trial by ambush since the court allowed an inadequate opening statement.

The Defendants also argue that the State failed to make any mention of the law of principals or conspiracy in its opening statement, while the law of principals was factored heavily into the State's closing argument.

In addition to citing La.Code Crim.P. art. 766, the Defendants cite two Louisiana Supreme Court cases where reversible error was found because of the state's inadequate opening statement. In *State v. Silsby*, 176 Ls. 727, 146 So. 684 (1933), the defendant's confession was admitted into evidence despite the fact that the state failed to mention the confession in its opening statement. Finding the confession should have been excluded, the court in *Silsby* found reversible error. Notably, at the time *Silsby* was decided, La.Code Crim.P. art. 333 stated the following regarding the requirements of an opening statement:

> The jury having been empanelled and the indictment read, the trial shall proceed in the following order: The reading of the plea to the jury; the opening statement of the district attorney explaining the nature of the charge and the evidence by which he expects to establish the same[.]

*Id.* at 688.

When the legislature enacted La.Code Crim.P. art. 766, the current article governing opening statements, it amended Article 333 to require the state to set forth the "nature of the evidence" rather than "the evidence."

Interpreting the requirements of La.Code Crim.P. art. 333, the supreme court in *Silsby* stated:

> In our opinion the statute requires the district attorney to set forth not only *the facts* which he expects to prove, but also *the evidence*, i.e., the nature of the evidence, by which he expects to prove them, whether oral or written, or direct or circumstantial, or confessed. When the trial begins the time for skirmishing is over and the battle is on; and the statute contemplates that the state itself shall thenceforth battle in the open and not behind remparts; that the district attorney shall then '*show his hand as to the state's evidence*, as a matter of fairness to the accused.' And whilst we readily concede and cheerfully attest the uniform endeavor of prosecuting officers in this state, and especially of the prosecutor in charge of this case, to deal

fairly with all accused alike, nevertheless we are of opinion that in this instance he has, out of excess of precaution, allowed himself to be led into error by the theories of law-writers speculating on systems of procedure which have nothing in common with that now prevailing in this state and so established by statute.

*Silsby*, 146 So. at 689.

The other case cited by the Defendants is *State v. Ducre*, 173 La. 438, 137 So. 745 (1931). In *Ducre*, the supreme court found reversible error occurred when the state failed to give any opening statement at all: "The language of article 333 is *mandatory*[,]" and "[j]udging from its phraseology, the purpose of the article in question must be to make the district attorney show his hand as to the state's evidence, as a matter of fairness to the accused[.]" *Id.* at 747.

We find that *Silsby* and *Ducre* are distinguishable from the present case in that they both interpreted La.Code Crim.P. art. 333 rather than La.Code Crim.P. art. 766. Additionally, *Silsby* involved the inadmissibility of a confession because it was not mentioned in the state's opening statement, and *Ducre* involved the failure of the state to give any opening statement at all.

More recently, the fifth circuit addressed a defendant's claim that the state's opening statement was "too general to properly describe the evidence with which the defendant would be confronted at trial." *State v. Clayton*, 570 So.2d 519, 524 (La.App. 5 Cir. 1990). The fifth circuit explained that the underlying purposes of La.Code Crim.P. art. 766 are to "prevent surprise and to permit preparation of defense trial strategy." *Id.* The fifth circuit further explained that Article 766 requires the state to "set forth, only in general terms, the prosecution's theory of the case. It is not necessary that the state detail every shred of evidence in an opening statement. It is sufficient for the state to give a general description of the evidence it plans to introduce. . . . The state need not name all of its witnesses in

the opening statement[.]" *Id.* (quoting *State v. Edwards*, 406 So.2d 1331, 1350 (La.1981), *cert. denied*, 456 U.S. 945, 102 S.Ct. 2011 (1982)).

In deciding whether the state's opening statement was sufficient, the fifth circuit noted that "[r]ulings on the proper scope of an opening statement are within the sound discretion of the trial judge and should not be disturbed absent a clear abuse of that discretion." *Id.* at 525 (citing *State v. Brown*, 428 So.2d 438 (La.1983), *overruled on other grounds by State v. Johnson*, 94-1379 (La. 11/27/95), 664 So.2d 94). The fifth circuit further stated that "[a]lthough the defense claim[ed] that the state's opening statement was insufficient, the defendant did not interpose any objection at trial to evidence being beyond the scope of the opening statement." *Id.* Furthermore, the court noted, "There is no indication in the record that the defendant was surprised by any evidence presented at trial or that she was prejudiced in the preparation of her defense." *Id.*

Applying this same analysis to the present case, the Defendants did not interpose any objection at trial to evidence being beyond the scope of the opening statement. There was also no indication at trial that the Defendants were surprised by any evidence presented at trial. The Defendants were obviously well aware of the fact that the State would be relying extensively on cell phone records and cell phone tracking because they introduced their own cell phone expert, Mr. John Minor.

In brief, the Defendants set forth one example of how the State's allegedly inadequate opening statement prejudiced them. The Defendants claim they were prevented from introducing photographs at trial because the State made no allegation of how the victim's Honda Accord arrived at the murder scene. The Defendants describe the photographs as follows:

The photographs depict co-defendant Carol Saltzman sitting in the driver's seat of an identical Honda Accord, in the same seat position of that of Bryan Davis' Honda Accord at the crime scene. These photographs of Saltzman showed that in the seat position as reflected in crime scene photographs and video, she would have not been able to reach the gas pedal or brake. These photographs were **relevant only** if the State was contending that Saltzman drove the car to the murder scene. Armed with these photographs pretrial, the prosecution did not allege in opening statement, or in its case in chief, that Saltzman drove the Honda to the crime scene on the day of the murder. This contention **was concealed** until the prosecution's final argument.

Had Defense counsel attempted to introduce the photographs before it was even alleged that Saltzman drove the Honda Accord to the murder scene, the prosecution would have pointed to this as guilty acknowledgement of that theory by the Defense, while using the law of principles [sic] to adopt another theory to render the photographs valueless. The photographs were not offered for this very reason. The State's failure to reveal a theory of how the murder occurred, placed the Defense in the impossible position of having to **disprove facts before they were alleged**.

Although this evidence may have been relevant to Defendant-Saltzman's defense, the Defendants fail to show that the alleged inadequacy of the State's opening statement prevented them from introducing this evidence. Before their case in chief, the Defendants should have been aware of the State's theory that Defendant-Saltzman drove the victim's Honda Accord to the scene. Agent Shute testified at length as to the cell phone evidence placing Defendant-Saltzman near the scene of the murder and the many phone calls from Defendant-Saltzman to Defendant-Davis near the time of the murder. Additionally, numerous witnesses (including both Defendants before trial) were questioned as to Defendant-Saltzman's use of the victim's Honda Accord on the day of the murder and as to the timing of when the Honda Accord was returned. Thus, the Defendants were put on notice of the State's theory that Defendant-Saltzman drove the Honda Accord to the murder scene before it put on its case in chief.

Additionally, we find that this theory should have been clear enough to the jury that the introduction of such photographs by the defense would not have been considered an admission of a fact not already suggested by the evidence. During its cross-examination of Deputy Baumgarten, defense counsel asked if it would have been prudent for the detectives to recline the seats or change the appearance of the interior of the victim's vehicle. Deputy Baumgarten testified that to the best of her knowledge, no one drove the victim's vehicle or moved things around in the vehicle. Then, during the State's questioning of Deputy Baumgarten, she stated that she was not aware that the Honda Accord's seats were ever moved. Thus, the issue of "seat moving" was broached during the State's case.

Furthermore, in light of the cell phone evidence placing the Defendants near the murder scene both the day before and the day of the murder as well as the inconsistencies revealed in the Defendants' statements, we find that the introduction of these photographs would not have swayed the jury to reach a different verdict. Considering the above, the trial judge did not abuse his discretion in overruling the Defendants' objection to the State's opening statement.

Accordingly, this assignment lacks merit.

**ASSIGNMENT OF ERROR NUMBER SEVEN:**

By this assignment of error, the Defendants allege that the trial court erred in allowing the testimony of Agent William Shute, an expert in cell site analysis. For the reasons that follow, we find that the trial court did not err in accepting Agent Shute as an expert.

Prior to Agent Shute testifying at trial, a *Daubert* hearing was held. Agent Shute testified that he is a special agent with the FBI and is currently assigned to a unit known as the "Cellular Analysis Survey Team" (CAST). Agent Shute has been using cellular technology in investigations for the FBI for the last twelve

years.  In these investigations, Agent Shute primarily uses historical cell site analysis – "the act of taking call detail records from one's cellular telephone and taking that information, which is the cell site that is utilized by the phone for service, and taking that and creating a mapped projection as to where that geographical area that that cell site covers."

As for his training, Agent Shute testified that he has had over 800 hours of training through the FBI's engineering research facility as well as through several private companies.  In his work with the FBI, Agent Shute works every day with the different technologies used by the different cell phone providers.  According to Agent Shute, it is necessary to understand the different technologies to understand the way a cell phone works and operates through the network from the moment a phone call is made, "how it's recorded through the cellular network, what happens with the phone, how the phone reselects to different cell sites[.]"  When asked if there is a scientific standard with regard to how the cell phone technology operates, Agent Shute responded:

> Well, sure.  All of those - - all of those technologies have scientific principles of the way they operate.  Code Division Multiple Access is a - - is a technology based on scientific standards the way that, you know, the technology operates.  So you have all of these companies with technologies that are proven technologies that are based on scientific principles of the way, you know, radio communications work.

Agent Shute also received training in radio frequency theory – "the way radio waves operate, the way they're emitted from antennas, received at antennas, the way they travel through the air[.]"  Radio waves are important in cell phone technology, Agent Shute stated, because "it's radio frequency."

Agent Shute testified that he works with all of the major cellular providers: T-Mobile, AT&T, Verizon, Sprint, Nextel, Metro PCS, U.S. Cellular, and Centennial Wireless.  Agent Shute is the point of contact for the cellular providers,

working with them to set up training, speaking at their conferences, and constantly interacting with them.

As a certified FBI instructor, Agent Shute created the only FBI course on historical cell site analysis. The course has been taught twenty-five times to over 1500 people and teaches investigators how to take call detail records and geographically plot them in order to affect investigations. To perform a historical cell site analysis, Agent Shute explained, one must have the call detail records and mapping software. To be an expert in historical cell site analysis, one needs to have: 1) knowledge of how a cell phone network operates; 2) experience in going through volumes of call detail records; and 3) practical experience in geolocating a cell phone that is "attached" to a human being.

Agent Shute testified that the CAST team utilizes the cell technology every day to help find victims, witnesses, violent felons, fugitives, and missing children. Agent Shute described how this technology was used to find an abducted child two years prior. The only information the agent had was the kidnapper's call detail records. With the call detail records, Agent Shute was able to determine that the kidnapper was traveling on Interstate I-20 through South Carolina. Additionally, Agent Shute estimated the kidnapper's driving speed based on the cell sites utilized. Agent Shute notified the Georgia Highway Patrol of the approximate time the kidnapper would cross the border, and the Georgia Patrol successfully recovered the child within seven minutes of the approximated time.

Agent Shute has provided historical cell phone analysis in over 1000 cases, over 100 of which were in court. Agent Shute has testified in court over fifty times and has been qualified in approximately fifteen states (in both state and federal courts) as an expert in the field of historical cell site analysis.

In this particular case, Agent Shute testified that he used an engineering cell phone, which is a phone that can be looked at in engineering mode, as well as an apparatus called the ICS-2. Once a phone is in engineering mode, Agent Shute explained, one can see the signal strength of the phone and the cell site that the phone is on. In driving around with the engineering cell phone, Agent Shute looked for the furthest possible distance that a phone could have been from the tower. Agent Shute further explained:

> Well, I went to most of the towers in this case to - - just to view them to see them and make sure that the orientation was accurate the way it was laid out by the tower list. I also went and - - to key locations, to several locations where, you know, we - - where law enforcement I guess was able to determine that both the victim as well as the defendants in the case were located. And so I would want to go there to test with the phone as well to make sure at that time that the cell phone being used - - or the cell site being used, rather, is accurate with the - - what I got as a reading at that location.

When at a location, Agent Shute's equipment would tell him to which tower the phone was connected.

Although a cell signal can go on for "quite a distance," Agent Shute explained that what really matters is what tower the phone chooses. According to Agent Shute, a cell phone knows which cell sector (or tower) to go to because it is constantly going through a process called "stacking and racking." Every couple of seconds, the phone surveys its environment to see what cell site has the clearest possible signal. The "serving cell site" will be placed at the top and that will be the site or tower that the phone uses for service. The "serving cell site" will not always be the closest tower, Agent Shute explained. In urban areas, it usually is the closest tower. In areas where the towers are very high, however, the serving cell site will not always be the closest tower.

When asked if this technology is considered accurate, Agent Shute responded, "If - - if it wasn't accurate, we wouldn't have - - we wouldn't solve the

crimes that we've solved and recovered the people that we've recovered." Also, when asked if the technology has been subject to peer review, Agent Shute testified that the members of the CAST team review each other's work all of the time. The CAST team also creates practical exercises when training new members. The team will take actual phones on the street, make phone calls, and translate the information into a case scenario. According to Agent Shute, the call detail records always match the location of the members. Finally, Agent Shute testified that historical cell site analysis is generally accepted in the community.

On cross-examination, Agent Shute agreed that the technology used is a mixture of both science and an "expression of specialized knowledge." Agent Shute further testified that the steps used in this technology are repeated every day by law enforcement. As for the rate of error, Agent Shute stated the technology is always accurate. Agent Shute explained that there is no rate of error because the cell phone either connected to the network or it did not. Agent Shute also testified that when he viewed the cell phone towers utilized in this case, they were the same as they were in 2009. As for peer reviews, Agent Shute testified that the analysis he uses is peer reviewed all of the time by the cell phone companies and other companies for whom he provides training.

When asked if the tracking he did of the girl abducted in South Carolina was "live-time tracking," Agent Shute said it was not live-time tracking, but historical. Agent Shute explained that the moment a phone call is made and hung up, it is a historical record. Agent Shute further explained that the intelligence used to find the person in the end varies in every case.

Defense counsel asked Agent Shute about a case in Utah, *United States. v. Allums*, No. 2:08-CR-30 TS, 2009 WL 806748 (D. Utah March 24, 2009) (unpublished opinion), wherein Agent Shute testified that no peer review had been

71

done. Agent Shute explained that at the time that case was decided, there was no peer review.

As for the signal strength from a tower, Agent Shute testified that generally speaking the range stays the same, but it could be changed or altered. Agent Shute testified that the weather does not affect the range much.

At the conclusion of Agent Shute's testimony, defense counsel argued that even though Agent Shute is not a scientist, his opinion must receive the same degree of scrutiny as a scientist. Defense counsel argued that the methodology has not been subject to much review. Defense counsel additionally argued that Agent Shute does not have any accreditation or meaningful credentials. Finally, defense counsel argued that the *Daubert* criteria had not been satisfied.

After hearing the arguments of both the state and the defense, the trial court accepted Agent Shute as an expert.

In brief, the Defendants argue that Agent Shute's methodologies are investigative techniques, not science. The Defendants further argue that the State failed to prove that the methodology used by Agent Shute has been tested, validated, or subject to any peer review study so as to determine any error rate. Furthermore, the Defendants argue that the trial court failed to enunciate how the criteria set forth in *Daubert* were satisfied in this case.

Louisiana Code of Evidence Article 702 sets forth the general rule governing the admissibility of expert testimony in Louisiana:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In *State v. Foret*, 628 So.2d 1116 (La.1993), the Louisiana Supreme Court adopted the test set forth by the United States Supreme Court in *Daubert v. Merrell*

72

*Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993), as a means for determining the reliability of expert scientific testimony. *State v. Chauvin*, 02-1188 (La. 5/20/03), 846 So.2d 697. Later, the United States Supreme Court held that the *Daubert* test applied not only to testimony based on scientific knowledge but also to testimony based on "technical" and "other specialized" knowledge. *Id.* at 701, n.8 (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167 (1999)). As for the decision to reject or accept the person as an expert, that decision "falls to the great discretion of the trial court, whose rulings will not be disturbed absent an abuse of that discretion." *State v. Edwards*, 97-1797, p. 25 (La. 7/2/99), 750 So.2d 893, 908-09, *cert. denied*, 528 U.S. 1026, 120 S.Ct. 542 (1999) (citing *State v. Craig*, 95-2499 (La. 5/20/97), 699 So.2d 865, *cert. denied*, 522 U.S. 935, 118 S.Ct. 343 (1997)).

The factors set forth by the *Daubert* court are: 1) "[t]he 'testability' of the scientific theory or technique;" 2) "[w]hether the theory or technique has been subjected to peer review and publication;" 3) "[t]he known or potential rate of error; and 4) [w]hether the methodology is generally accepted in the scientific community." *Id.* at 909 (quoting *State v. Quatrevingt*, 93-1644 (La. 2/28/96), 670 So.2d 197, 204, *cert. denied sub nom*, 519 U.S. 927, 117 S.Ct. 294 (1996), and *Daubert*, 509 U.S. at 592-95).

Although the Defendants argue that Agent Shute's methodology has not been tested, it has been tested by its use to successfully apprehend fugitives as well as missing children. Agent Shute also testified that the methodologies have been peer-reviewed, have no rate of error, and have been accepted in the law enforcement community. We find that the United States District Court in Utah's acceptance of Agent Shute's expert testimony is persuasive. Further, the United

States Fifth Circuit has upheld the admissibility of expert testimony in the field of historical cell site analysis:

> Anderson's assertion that the district court erred by allowing the expert testimony of Agent Chad Michael Creasey in the field of historical call site analysis because the field "bears none of the indicia of scientific reliability that would justify an exception to the general prohibition against opinion testimony" is equally without merit. We review the district court's decision to admit or exclude evidence for abuse of discretion. *United States v. Morgan*, 505 F.3d 332, 339 (5th Cir. 2007).
>
> . . . .
>
> Testimony established that the field is neither untested nor unestablished. Agent Creasey detailed his extensive knowledge and experience in the field. According to Agent Creasey, he had used the technique, without error, on at least 100 occasions, and the FBI had been successful at least 1000 times. Agent Creasey taught courses on the subject. Furthermore, individuals whom Agent Creasey taught and supervised had used their historical cell site analysis training to provide expert testimony, and the technique has been accepted by approximately [sic] federal courts as a field of expertise. *See United States v. Weathers*, 169 F.3d 336, 339 (6th Cir. 1999) (allowing expert testimony based on cell site analysis); *United States v. Sepulveda*, 115 F.3d 882, 891 (11th Cir. 1997) (same).

*U. S. v. Schaffer*, 439 Fed.Appx. 344, 346-47 (5th Cir. 2011).

Given the above, we find that the trial court in the present case did not abuse its discretion in allowing Agent Shute to testify as an expert in the field of historical cell site analysis.

**ASSIGNMENT OF ERROR NUMBER EIGHT:**

The Defendants allege that the trial court erred in allowing George Schiro to give an expert opinion as to the probability that the victim was shot with his own gun. The Defendants argue that Mr. Schiro was not qualified to give such an opinion, especially when the State's own ballistics expert would not give such an opinion. Finally, the Defendants argue that Mr. Schiro's opinion was not supported by the evidence.

Prior to Mr. Schiro's testimony at trial, defense counsel argued that Mr. Schiro was not qualified to give an opinion as to whether the victim was shot with his own gun:

> I think he is making a stretch when he says it's possible that he was shot with his own gun. Well, anything's possible, and I think that him saying that really indicates that he is not qualified.
>
> There's been no testimony that he's a ballistics expert or anything of that nature. And certainly if he looked at Mr. Lancon's report, he certainly can't make a leap that Mr. Lancon couldn't make. So, I don't think he should be allowed to give those opinions, Your Honor.

Although the trial court originally expressed concern with Mr. Schiro rendering an opinion as to whether the victim was shot with his own gun, the trial court allowed Mr. Schiro to give such an opinion. Based on the trial court's ruling, Mr. Schiro testified as follows as to the probability that the victim was shot with his own gun:

> The evidence at the scene supports a probability that he may have been shot with his own gun. Given that there's a particular type of ammunition called Hydra-Shoks and, you know, the shootings that I have investigated, you rarely ever see Hydra-Shoks, with the exception of law enforcement personnel or shooting enthusiasts.
>
> I saw photographs of that same type of ammunition at Mr. Davis' house, so I just think that lends more support, and given the fact that the bullets recovered from his body were Hydra-Shoks and the cartridge casings found at the scene were Federal just lends more support to that he may have been shot with his own gun.

The State clarified with Mr. Schiro that no one knew for sure whether the victim was shot with his own gun.

On cross-examination, defense counsel questioned Mr. Schiro as to his opinion:

> Q: And part of your opinion is based upon reading the report from Mr. Lancon who used to be with the Acadiana office, who now resides in Montana, correct, sir?
>
> A: Yes.

75

Q: And Mr. Lancon told the jury that he couldn't say for sure whether the bullets that were fired were from any particular gun, and he listed a number of types of 9 millimeter weapons that could have fired those rounds. Did you read that in his report, sir?

A: Yes. And I believe one of them was the same model of gun that Mr. Davis owned.

Q: Right. So you looked at what Mr. Lancon had to say, but opined that it may have come from his gun.

A: I would say the evidence found at the scene and Mr. Davis' body supports that it could have come from his gun, yes.

Q: Could have?

A: Yes.

Q: Again, sir, it could not have?

A: You can't rule that out. That's correct.

Q: The best you - -

A: Without the firearm, you can't rule that out.

Q: The best you can do is say "it may indicate," or "perhaps," "the shooter may have," a probability that he may have been shot with his own gun - - there's a probability that he may have been shot with his own gun?

A: Yes.

After reading Mr. Schiro's *Daubert* examination, we find that there was very little testimony, if any, that Mr. Schiro was qualified to give expert testimony regarding ballistics. However, Mr. Schiro's testimony involved his experience in investigating crime scenes rather than his expertise in ballistics. During the *Daubert* hearing, Mr. Schiro stated that he had visited over 100 physical crime scenes. Having visited so many crime scenes, we find that Mr. Schiro was qualified to testify as to the rarity of Hydra-Shok ammunition in the crime scenes he has investigated. Mr. Schiro specifically testified that in the shootings he has investigated, he has rarely seen Hydra-Shoks, except when the shooting involved

76

law enforcement personnel or shooting enthusiasts. Based on Mr. Schiro's experience in visiting crime scenes, we find that Mr. Schiro was qualified to make this statement.

Furthermore, Mr. Schiro's opinion concerning the fact that the victim was shot with his own gun was ambivalent and further neutralized on cross-examination. Mr. Schiro testified that the victim could have been shot with his own gun but there was no way to tell for sure without having the gun. According to the supreme court, "Expert testimony becomes problematic when it infringes upon other interests: for example, when it is unduly prejudicial, when it invades the province of the jury, when it bolsters a child-witness' testimony, or when it leads to a 'battle of the experts.'" *Chauvin*, 846 So.2d at 703. We find that Mr. Schiro's testimony did not infringe upon any of these interests. Because of its ambivalent nature, the testimony was not unduly prejudicial to the Defendants. Additionally, Mr. Schiro's testimony did not invade the province of the jury, bolster any witnesses' credibility, or lead to a "battle of the experts." In fact, the State's own ballistics expert, Douglas Lancon, testified that at least eleven different manufacturers could have manufactured the gun that was used to shoot the victim. Mr. Lancon by no means opined that the victim was shot with his own gun. Thus, if there was any "battle of the experts," it was between the State's own experts.

Accordingly, this assignment lacks merit.

**ASSIGNMENT OF ERROR NUMBER NINE:**

The Defendants argue that La.Code Crim.P. art. 782's requirement that ten out of twelve jurors must concur to reach a verdict violated their constitutional right to a unanimous verdict. The jurors in this case found the Defendants guilty by a vote of 11-1. In its brief, the State claims the Defendants waived this claim by failing to raise it in the trial court. We agree that the issue was not raised by either

Defendant in the trial court. Thus, the Defendants are not entitled to have this issue reviewed and considered by this court. La.Code Crim.P. art. 841; *State v. Brooks*, 12-226 (La.App. 5 Cir. 10/30/12), 103 So.3d 608, *writ denied*, 12-2478 (La. 4/19/13), 111 So.3d 1030.

Furthermore, the Louisiana Supreme Court has long found this issue to be constitutional. *State v. Edwards*, 420 So.2d 663 (La.1982). Thus, even if this issue had been raised in the lower court, the lower court would not have been at liberty to ignore the controlling jurisprudence of superior courts that a non-unanimous jury verdict is constitutional in non-capital cases.

Accordingly, this assignment lacks merit.

**DECREE:**

The conviction of the defendant, Robyn B. Little Davis, is affirmed.

**AFFIRMED.**

NUMBER 13-275

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

STATE OF LOUISIANA

VERSUS

ROBYN B. LITTLE DAVIS

**CONERY, J., dissents for the following reasons.**

Co-defendants, Robyn B. Little Davis and Carol Noland Saltzman were tried together and convicted of second degree murder and sentenced to life imprisonment based on controversial circumstantial evidence. In separate but essentially identical opinions, the majority chose to affirm each of their convictions and sentences. I respectfully dissent.

Louisiana Code of Criminal Procedure Article 790 mandates that after jury selection has been completed, "the jurors *shall then* be sworn together to try the case[.]" (Emphasis added). "Shall" means that it is mandatory. "Then" means right away, not five and a half months later.

In *Rhymes v. Rhymes*, 13-0823 (La. 10/15/13), ___ So.3d ___, our supreme court again reiterated the well-established rules of statutory construction:

> In accord with these rules, the interpretation of any statutory provision starts with the language itself. *Oubre v. Louisiana Citizens Fair Plan,* 11-0097, p. 11 (La. 12/16/11), 79 So.3d 987, 997. When the provision is clear and unambiguous and its application does not lead to absurd consequences, its language must be given effect, and its provisions must be construed so as to give effect to the purpose indicated by a fair interpretation of the language used. La. Civ. Code art. 9; La. Rev. Stat. § 1:4; *In re Clegg,* 10-0323, p. 20 (La. 7/6/10), 41 So.3d 1141, 1154. Unequivocal provisions are not subject to judicial construction

and should be applied by giving words their generally understood meaning. La. Civ. Code art. 11; *see also Snowton v. Sewerage and Water Bd.,* 08-0399, pp. 5-6 (La. 3/17/09), 6 So.3d 164, 168.

Words and phrases must be read with their context and construed according to the common and approved usage of the language. La. Civ. Code art. 11; La. Rev. Stat. § 1:3. The word "shall" is mandatory and the word "may" is permissive. La. Rev. Stat. § 1:3; *Oubre,* 11-0097 at 12, 79 So.3d at 997. Every word, sentence, or provision in a law is presumed to be intended to serve some useful purpose, that some effect is given to each such provision, and that no unnecessary words or provisions were employed. *Colvin v. Louisiana Patient's Compensation Fund Oversight Bd.,* 06-1104, p. 6 (La. 1/17/07), 947 So.2d 15, 19; *Moss v. State,* 05-1963, p. 15 (La. 4/4/06), 925 So.2d 1185, 1196. Consequently, courts are bound, if possible, to give effect to all parts of a statute and to construe no sentence, clause, or word as meaningless and surplusage if a construction giving force to and preserving all words can legitimately be found. *Oubre,* 11-0097 at 12, 79 So.3d at 997. With this understanding, we turn now to the relevant Civil Code provisions.

In this case, twelve jurors and two alternates were selected and individually sworn pursuant to La.Code Crim.P. art. 786. Both the State and defendants accepted each juror and alternate and had no additional challenges under La.Code Crim.P. art. 795. After selecting and individually swearing all the jurors, defendants requested that the jury be sworn as a panel. Instead, the court recessed until the next morning at the request of the prosecution and did not swear in the jury as a panel under La.Code Crim.P. art. 790. The next day, the defendants again moved that the jury be sworn as a panel. The State orally moved for a continuance based on the lead prosecutor's alleged illness and inability to proceed. The court granted the motion, continued the case without date, and discharged the jury. Defendants objected and proposed a short weekend recess in lieu of a continuance, which proposal was denied by the trial court. The trial court then allowed the prosecutor to supplement the record with a written, albeit untimely, motion for continuance as required by La.Code Crim.P. art. 707.

2

Not only was the State's motion for continuance untimely and not in proper form under La.Code Crim.P. art. 707, La.Code Crim.P. art. 708 is clear that a continuance may not be granted after a jury trial has commenced. *State v. Hedgspeth*, 42-921 (La.App. 2 Cir. 1/9/08), 974 So.2d 150. Under La.Code Crim.P. art. 761, a jury trial commences after the first juror is sworn. Clearly, the continuance granted in this case was improper, as all twelve jurors and two alternates had been individually sworn pursuant to La.Code Crim.P. art 786.

The majority cites *State v. Tuckson*, 00-1408 (La.App. 3 Cir. 2/28/01), 781 So.2d 807, for the proposition that the trial judge has some flexibility as to when to swear all the jurors together as a completed panel under La.Code Crim.P. art. 790. The court found that a one day delay in that case was not an abuse of discretion. It may be reasonably argued that the word "then" following the word "shall" may give a trial judge some very limited flexibility under La.Code Crim.P. art. 790. The word "immediately" was not used. In some circumstances, then, it could be argued that a weekend recess as requested by defendants in this case may have been in order so that the court could better determine whether the prosecutor could proceed, or whether someone else in his office could try the case. Here, the trial court instead denied the defense request for a weekend recess, granted the State a continuance without date, and dismissed the jury, all over defendants' objections. It was error for the trial judge to do so. La.Code Crim.P arts. 708; 790; *Hedgspeth*, 974 So.2d 150.

The question then becomes whether the defendant was prejudiced in this case. It is undisputed that the trial judge refused to immediately swear in the jury panel under La.Code Crim.P. art. 790 after all jurors were individually selected, as requested by defendant and in direct contravention of the mandatory wording

3

"shall then" in the article. He likewise did not do so on the following day. Double jeopardy would have attached under La.Code Crim.P. art. 592 had the panel been sworn. In *Tuckson*, no prejudice was found by a one day delay in swearing the jury as mandated by La.Code Crim.P. art. 790. The conviction was affirmed.

In this particular case, the facts are different. During jury selection it was discovered that the State's lead crime scene and forensic investigator, Officer Baumgarten, had a conflict for the upcoming week of the trial. A highly unusual recess in jury selection was called by the court, and the State was allowed to "perpetuate" her testimony by video in open court before the judge, but outside the presence of the prospective jurors. The State intended to offer the video of Officer Baumgarten's testimony at trial in lieu of her live testimony. The defendants objected, claiming that such a procedure violated their right to confront this key witness live before the fact finder, the jury. The trial judge overruled the objection. Twenty-four items of evidence were introduced into evidence during Officer Baumgarten's testimony.

Later, after the continuance was granted, the State was allowed to withdraw some of the previously introduced evidence by ex-parte motion. When defense counsel learned of the State's request, he requested that the trial court conduct a contradictory hearing and the court agreed. Following the hearing, the trial court allowed the State to withdraw all of the evidence introduced in connection with Officer Baumgarten's video testimony. In effect, the State was allowed to start all over, allegedly plugging the holes in its case that had been discovered when defendants had vigorously cross examined Officer Baumgarten during her "perpetuated" video testimony.

Defendant argues that she was unfairly prejudiced by this procedure because

4

the State had time to correct some of the weaknesses in its case, "shore up" Officer Baumgarten's testimony, and "plug the holes" in its case. According to Defendant, Officer Baumgarten's testimony at the trial was materially and significantly different than the testimony she offered on video. The video was not introduced in evidence. In fact, at the trial of this case, the trial judge refused to allow the defendant to mention, comment upon, or use Officer Baumgarten's testimony from her perpetrated video testimony except for direct impeachment, and then with no explanation of the circumstances under which the prior statement had been made. Here, again, Defendant's Sixth Amendment Right to confrontation was arguably curtailed by the trial court.

Perhaps most importantly, the State was allowed to obtain additional DNA tests on evidence that had been collected at the scene but not previously submitted for testing. One such DNA test revealed unknown male DNA evidence found under the victim's fingernails, a fact not disclosed to the defendant until the second day of the rescheduled trial, arguably in direct violation of defendant's right to be promptly notified of potentially exculpatory evidence.

LeAnne Suchanek, a DNA analyst, testified as an expert at the trial on behalf of the State and stated: "These particular fingernails had some blood on them." Ms. Suchanek admitted that even though she admitted that she did not have a DNA sample from the victim to compare, she nevertheless opined that the blood and material found on and under the victim's fingernails was from the victim himself, and not a third party.

Most importantly, the defendants were not given the additional DNA test results prior to the trial and had no opportunity to conduct its own tests or even meaningfully challenge Ms. Suchanek's opinion. In all, thirty-two additional items

of evidence were tested by the State after the continuance and before the second trial.

The State was also allowed to add and call another crime scene expert not previously listed who, over defendant's objections, offered testimony on ballistics, a subject matter about which he was not qualified to testify as an expert. The State further had an opportunity to interview several defense witnesses disclosed by defendant during voir dire, and had the opportunity to listen to all of defense counsels' voir dire, hence obtaining a better understanding of the defense strategy.

Further the State had more time to prepare its key witness, the FBI "expert" on cell phone site analysis, whose critical testimony was used by the State to attempt to tie this purely circumstantial case together. As previously indicated, and perhaps equally important, the State had more time to strengthen Officer Baumgarten's testimony, with no ability on the part of Defendant to introduce her earlier video testimony to demonstrate to the jury her previous demeanor, manner of testifying, and content of her previous testimony.

By not swearing the jury as a panel immediately after all were selected as mandated by La.Code Crim.P. art. 790, and then granting a continuance in violation of La.Code Crim.P. arts. 707 and 708, the defendants obviously faced a completely different trial than they would have had the continuance been denied. The trial court committed legal error and Defendant was prejudiced.

In *State v. Fisher,* 168 La. 584, 122 So. 858 (1929) (quoting from *State v. Conda,* 156 La. 679, 101 So. 19 (1924), the supreme court provided guidance on the issue of prejudice that is timely today: "It is frequently very difficult to draw the line between error which is harmful and error which is not. Where doubt is present, the accused should receive the benefit."

6

A fortiori, considering all the circumstances of this case, the clear violation of La.Code Crim.P. art. 790 prejudiced Defendant's right to a fair trial.

**Conclusion**

Finding error and prejudice in Defendant's first assignment of error, discussion of the remaining assignments of error is pretermitted. I find that under the unusual circumstances of this case, Defendant has shown a clear error of law and sufficient prejudice to warrant a new trial.

I would, therefore, reverse the conviction and remand the case for a new trial.